ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street
PO Box 093
Trenton, NJ 08625-0093
Attorney for Plaintiff State of New Jersey


By:   Timothy P. Crowley (58758)
      Deputy Attorney General
      (609) 633-7087

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| STATE OF NEW JERSEY, | ) | |
| | ) | |
|    Plaintiff, | ) | Civil Action No. |
| | ) | |
|        v. | ) | |
| | ) | |
| RELIANT ENERGY MID-ATLANTIC POWER | ) | |
| HOLDINGS, LLC, RELIANT ENERGY POWER | ) | |
| GENERATION, INC., RELIANT ENERGY, | ) | |
| INC., CENTERPOINT ENERGY, SITHE | ) | |
| ENERGIES, INC., METROPOLITAN | ) | |
| EDISON CO., AND GPU, INC. | ) | |
| | ) | |
|    Defendants. | ) | |
| | ) | |

## COMPLAINT

The State of New Jersey ("New Jersey"), represented by, and

by authority of, the Attorney General of the State of New Jersey,

alleges:

### NATURE OF THE ACTION

1.   Pursuant to 42 U.S.C. § 7604(a)(1) and (a)(3), Plaintiff

commences this civil action against Defendants Reliant Energy Power

Generation, Inc., Reliant Energy Mid-Atlantic Power Holdings, LLC,

Reliant Energy, Inc. (collectively "Reliant"), Sithe Energies, Inc.

("Sithe"), and Metropolitan Edison Co. and GPU, Inc. ("Metropolitan Edison")(collectively, "Defendants"), based on their construction and/or continued operation of a modified major emitting facility without the permits required by Part C of Title I of the Clean Air Act ("the CAA or the Act"), 42 U.S.C. §§ 7470-7503 (the Prevention of Significant Deterioration ("PSD") provisions), and the Pennsylvania State Implementation Plan, which incorporates the federal program at 40 C.F.R. Part 52, Subpart NN, §§ 52.2020 through 52.2063, including §§ 52.2058 and 52.2023.

2.    Reliant owns and operates several coal-fired power plants in Pennsylvania, including the Portland Generating Station ("Portland," "the Portland Plant" or "the Plant"), which is located upwind and directly across from the Delaware River, Pennsylvania-New Jersey state line, and Warren County, New Jersey, in Upper Mount Bethel Township, Northampton County, Pennsylvania. As a byproduct of the production of electricity and as a result of its operations, Portland emits sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), nitrogen dioxide ($NO_2$) (a form of nitrogen oxide ($NO_x$)) and particulate matter ("PM"). These pollutants are associated with a plethora of adverse environmental impacts from their contribution to acid rain to the formation and creation of ozone and fine particulate matter ("$PM_{2.5}$"), and adverse health impacts such as the exacerbation of respiratory illnesses. The prevailing winds carry $SO_2$, $NO_x$ and $NO_2$ and particulates from the

2

Plant to New Jersey where they have caused harm, and continue to cause harm, to New Jersey's air quality, its citizens and environment. At Portland, Defendants undertook modifications as defined by the Act of the physical plant that have resulted in increased emissions of $SO_2$ and $NO_x$ and PM, but failed to undergo the preconstruction review required under the PSD provisions of the CAA, 42 U.S.C. §§ 7470-7492, that would have required, *inter alia*, the installation of pollution control equipment designed to minimize these emissions and an analysis of impact on ambient air quality standards.

3.    At no time did Defendants apply for or obtain the preconstruction permits required under the PSD provisions of the Clean Air Act and their implementing regulations or any equivalent state program. 42 U.S.C. § 7475. Defendants have operated, and Reliant continues to operate, the Plant without applying best available control technology ("BACT") to control emissions as required by the PSD provisions. Id. As a result, excessive amounts of $SO_2$, $NO_x$, and PM have been, and still are being, released into the atmosphere from the Plant.

4.    New Jersey brings this civil action against Defendants pursuant to 42 U.S.C. § 7604 (a)(1) and (a)(3) to address Defendants' ongoing violations of the Act.

### JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of

3

this action pursuant to 42 U.S.C. §§ 7604(a) and 7477, 28 U.S.C. §§ 1331 and 1355, and 29 U.S.C. § 1367.

6.    Venue is proper in this District pursuant to Section 304(c)of the CAA, 42 U.S.C. § 7604( c), and pursuant to 28 U.S.C. § 1391, because the violations occurred--and are occurring--in this District, and because the Plant--which is the subject of this Complaint--is located within this District.

7.    Although advance notice is not required before a civil action may be commenced pursuant to 42 U.S.C. § 7607(a)(3), New Jersey provided notice on November 16, 2005 via certified mail to Reliant Energy Mid-Atlantic Power Holdings, LLC, Reliant Energy Power Generation, Inc., Reliant Energy, Inc., Centerpoint Energy, Sithe Energies, Inc., Metropolitan Edison Co., and GPU, Inc. and relevant federal and state officials, of New Jersey's intent to file an action against Defendants for violations of the federal PSD requirements and implementing regulations at the Plant should the violations not be addressed.  (This Notice was sent, via certified mail, to a corrected address to Reliant Energy Mid-Atlantic Power Holdings, LLC on December 2, 2005).  More than 60 days have elapsed since New Jersey provided this notice.  In addition, the United States Environmental Protection Agency ("EPA") has not commenced a civil action against Defendants for the violations set forth in this Complaint.  See 42 U.S.C. § 7604(b)(1)(B).

4

### THE PLAINTIFF

8.    Plaintiff New Jersey is a body politic and sovereign entity which brings this action on behalf of itself and, as parens patriae, on behalf of all residents and citizens of the State.

### THE DEFENDANTS

9.    Upon information and belief, Reliant Energy, Inc. was formerly known as Reliant Resources, Inc. Reliant Resources, Inc. changed its corporate name to Reliant Energy, Inc. effective April 26, 2004.    Reliant Energy, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1000 Main Street, Houston, Texas 77002.

10.    Upon information and belief, Reliant Energy Mid-Atlantic Power Holdings LLC ("Reliant Energy Mid-Atlantic"), formerly Sithe Pennsylvania Holdings, LLC, is the current owner and operator of the Portland Plant and has been the owner and operator of the Portland Plant since May 2000 at which time Reliant Energy, Inc., through its subsidiaries, purchased the equity from Sithe Pennsylvania Holdings LLC and its affiliates and subsidiaries.  As such, and upon information and belief, Reliant Energy Mid-Atlantic currently has a 100% ownership interest in the Portland Plant. Reliant Energy Mid-Atlantic is the direct subsidiary of Reliant Energy Northeast Generating Inc., which is an indirect subsidiary of Reliant Energy, Inc. and Reliant Resources, Inc. Reliant Energy Mid-Atlantic is a limited liability company organized under the

laws of the State of Delaware with its principal place of business
at 1111 Louisiana Street, Houston, Texas 77002.

11.   Upon information and belief, Reliant Energy Power
Generation, Inc. is a wholly owned subsidiary of Reliant Resources,
Inc.   Reliant Energy Power Generation, Inc. is a corporation
organized under the laws of the State of Delaware with its
principal place of business at 1000 Main Street, Houston, Texas
77002.

12.   Upon information and belief, Centerpoint Energy is a
holding company that is a corporation organized under the laws of
the State of Texas with its principal place of business at 1111
Louisiana Street, Houston, Texas 77002.   In August 2002, Reliant
Energy, Inc. reorganized itself into CenterPoint Energy, Inc.

13.   Upon information and belief, Sithe was the owner and
operator of the Portland Plant from November 1999 to May 2000.
Upon information and belief, Sithe was a limited partner in a
Delaware   Limited   Partnership   formed   in   November   1990   by
Sithe/Independence Power Partners, L.P., which is an indirect
wholly owned subsidiary of Sithe.   Sithe was organized under the
laws of the State of Delaware with its principal place of business
located   at   450   Lexington   Ave.,   New   York,   NY   10017.   Upon
information and belief, as of December 31, 1999, Sithe was a
privately owned entity of which 61.4% was owned by Vivendi, 29.6%
was owned by Marubeni Corporation and 9% was owned by the Sithe

6

Employee Stock Ownership L.P.

14.   Upon information and belief, Metropolitan Edison was the original owner and operator of the Portland Plant and owned and operated the Portland Plant until November 1999.  At all relevant times, Metropolitan Edison was a wholly owned subsidiary of GPU, Inc.  Metropolitan Edison is a corporation organized under the laws of the State of Pennsylvania with its principal place of business at 2800 Pottsville Pike, Reading, Pennsylvania, 19640.  GPU, Inc. is a holding company organized under the laws of  Pennsylvania with its principal place of business at 300 Madison Avenue in Morristown, New Jersey 07962.

15.   Defendants are each a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

### The Harm to New Jersey

16.   $SO_2$, $NO_2$, $NO$ (a form of $NO_x$) and PM emissions from Portland adversely impact the public health and the environment in New Jersey.

17.   Upon information and belief, from 2004 to 2006, the average emissions at Portland Unit 1 were 11,956.5 tons per year ("tpy") of $SO_2$ and 1,122 tpy of $NO_x$.  Upon information and belief, from 2004 to 2006, the average emissions at Portland Unit 2 were 18,207 tpy of $SO_2$ and 2,151 tpy of $NO_x$.  A July 2007 report by the Environmental Integrity Project, "Dirty Kilowatts America's Most Polluting Power Plants," ranks Portland as number five in terms of

highest 2006 $SO_2$ emission rate per megawatt ("MW") generated in the country.  See

http://www.dirtykilowatts.org/Dirty_Kilowatts2007.pdf.          The Environmental Integrity Project's May 2005 report ranked Portland as number eight in terms of highest 2004 $SO_2$ emission rate per MW in the country.  If Portland continues to operate without BACT controls, and other power plants are controlled, Portland's ranking will continue to go up.  In contrast, estimated annual emissions at Portland's Units 1 and 2 with BACT installed would total less than 1,000 tpy of $SO_2$ and less than 1,000 tpy of $NO_x$.

18.   Direct short-term exposures (e.g., less than three hours) to low levels of $NO_2$, a form of $NO_x$, may lead to changes in airway responsiveness and lung function in individuals with preexisting respiratory illnesses and increases in respiratory illnesses in children.  Long-term exposures to $NO_x$ may lead to increased susceptibility to respiratory infection and may cause irreversible alterations in lung structure.       In New Jersey, $NO_x$ emissions, including $NO_2$, contribute to the formation and transport of ozone (also referred to as $O_3$).   Ozone, a major component of smog, is created when $NO_x$ reacts with volatile organic compounds in the presence of sunlight.    Inhalation of ozone exacerbates many respiratory health problems, such as asthma, and decreases the ability of the lungs to function, sometimes permanently scarring the lung tissue.  Further, the trends of asthma rates and severity

8

are increasing.   According to a 1998 study by the American Lung Association, the overall prevalence rate for asthma increased 61% from 1982 to 1994.   Between 1970 and 1995, the age-adjusted rate of death from asthma rose from 0.9 per 100,000 in 1979 to 1.5 per 100,000 in 1995, a 67% increase.

19.   New Jersey and its citizens are harmed by the release of $NO_x$ emissions, including $NO_2$, in Pennsylvania, including, specifically, emissions from Portland, which contribute to the formation of ozone in New Jersey.   Because the prevailing winds are from the west and southwest, particularly during the summer, $NO_x$ emissions released from utilities in Pennsylvania travel to New Jersey.   This effect is exacerbated by Reliant's use of high power plant stacks at Portland.   Reliant's use of an approximate 400 feet foot smokestack at Portland increases the long range mobility of those emissions.   Congress recognized the phenomenon of ozone transport in the 1990 amendments to the Clean Air Act, noting that:

> The bill [Clean Air Act amendments] reflects an increasing understanding of how ozone pollution is formed and transported.   Because ozone is not a local phenomenon but is formed and transported over hundreds of miles and several days, localized control strategies will not be effective in reducing ozone levels.

Senate Report No. 101-228, reprinted in 1990 *U.S. Code Cong. and Admin. News* at 3389-99.

20.   Section 184 of the Act, 42 U.S.C. § 7511c, creates a single transport region for ozone ("ozone transport region").   This

section mandates specific SIP control programs for this region, as well as other measures necessary to reach attainment of ambient air quality standards.   Pennsylvania and New Jersey are within the ozone transport region.

21.   The Clean Air Act requires that each State Implementation Plan ("SIP") contain emission limitations and adequate provisions prohibiting   any   source   within   a   state   from   significantly contributing to the nonattainment of National Ambient Air Quality Standards of any other state.  42 U.S.C. § 7410(a)(2)(A), (D).  EPA has found that states upwind (here Pennsylvania) significantly contribute to a downwind state's (here New Jersey) inability to attain the ozone standards.  See 63 Fed. Reg. 57386 (October 27, 1998).   EPA explains, "[s]tates adjacent to the state with the nonattainment problem made the largest contribution."  Id.   In addition, EPA found specifically that Pennsylvania, as an upwind state, contributed significantly to New Jersey's nonattainment of the ozone NAAQS.  Id. at 57396.  EPA's modeling set forth in the Technical Support Document for the final Clean Air Interstate Rule predicts that Pennsylvania will contribute to New Jersey's 8-hour ozone nonattainment in 2010, 46% and 32% to Hunterdon and Morris Counties, respectively.   See www.epa.gov/air/interstateairquality/pdfs/finaltech02.pdf. Further,   air   quality   modeling   conducted   by   the   New   Jersey Department of Environmental Protection ("NJDEP") shows the Plant's

current maximum permitted $SO_2$ emission rate (which does not reflect a BACT emission rate) violates the NAAQS for $SO_2$ in Warren County, New Jersey. Also, fine particle emissions and $SO_2$ emissions (which convert to fine particles in the atmosphere) that Portland can emit are predicted to violate the NAAQS for $PM_{2.5}$ in Warren County, New Jersey.   Warren County is directly across the River from Northampton County, Pennsylvania where the Portland Plant is located.    As the home of upwind sources, Pennsylvania directly damages the public health and environment of New Jersey.

22.   $SO_2$ can be linked to bronchial reactions, reduced lung function, premature death and can destabilize normal heart rhythms of New Jersey's citizens.  Studies have demonstrated that children and adults with constructive pulmonary disease such as asthma are at increased risk from exposure to $SO_2$.  New Jersey's citizens are impacted by the toxic $SO_2$ emissions following only minutes of exposure and exercising asthmatics can experience lung constriction within 5-10 minutes of exposure.  See U.S. EPA, 1994, Supplement to the Second Addendum to the Air Quality Criteria of Particulate Matter and Sulfur Oxides (1982).

23.   $SO_2$ also interacts in the atmosphere to form sulfate aerosols, which may also be transported long distances through the air.  Most sulfate aerosols are a subset of $PM_{2.5}$ that can easily be inhaled.  In the eastern United States, sulfate aerosols make up over 25 percent of the inhalable particles, and according to recent

11

studies, high levels of sulfate aerosols are associated with increased sickness, respiratory distress, cardiovascular disease and mortality from lung disorders, such as asthma and bronchitis. Lowering sulfate aerosol emissions from electric utility plants would significantly reduce the incidence and severity of asthma and bronchitis, as well as associated hospital admissions and emergency room visits resulting from these ailments.

24.   Further, $SO_2$ and $NO_x$ emissions, including $NO_2$, contribute to the formation of acid deposition, which has caused lakes and ponds in New Jersey to become acidic.   $SO_2$ and $NO_x$ interact in the atmosphere with water and oxygen to form nitric and sulfuric acids, commonly known as acid rain.   $SO_2$ and $NO_x$ emissions from power plants cause acid rain, which also comes in the form of snow or sleet, and "acidifies" lakes and streams in New Jersey which can render them uninhabitable by aquatic life, such as fish, and contribute to damage of trees at high elevations.

25.   Separate and apart from acid rain issues, $NO_x$ emissions, including $NO_2$, cause eutrophication (excessive growth and decay of aquatic plant life, resulting in decreased oxygen levels in the water) of coastal waters in New Jersey, reducing the diversity of fish and other aquatic life in these essential waters. Additionally, $NO_x$ emissions lead to ozone injury to vegetation.

26.   Acid deposition also has adverse effects on human health.

12

Acid rain causes mercury to leach from the soil into waters, resulting in higher mercury levels in fish. In addition, acidified water may cause lead to leach from residential pipes, causing increased consumption of lead via drinking water.

27. Airborne particles with a nominal aerodynamic diameter of 2.5 micrometers or less are considered to be "fine particles" ($PM_{2.5}$). Power plants, like Portland, are a major source of both direct and secondary $PM_{2.5}$. Sulfate and nitrate formed by chemical reactions of sulfur dioxide and nitrogen oxides gases in the atmosphere after they are emitted are considered to be secondary $PM_{2.5}$. "Coarse particles" refer to particles that are smaller than or equal to 10 micrometers in diameter ("$PM_{10}$"). PM is the general term for all solid or liquid particles found in the air. $PM_{2.5}$ and $PM_{10}$ are subsets of PM. Like ozone, PM, $PM_{10}$ and $PM_{2.5}$ are emitted by the Portland Plant in Pennsylvania and are transported by prevailing winds to New Jersey. New Jersey's citizens are impacted, as breathing $PM_{2.5}$ at concentrations in excess of ambient air standards increases the chances of premature death, damage to lung tissue, cancer, or respiratory disease and cardiovascular disease. The elderly, children, and people with chronic lung disease or asthma tend to be especially sensitive to the effects of $PM_{2.5}$ and $PM_{10}$. PM can also worsen the effects of acid rain, reduce visibility, and damage man-made materials.

28. The CAA affords special protections to areas classified

13

as federal "Class 1" areas such as national parks and wilderness areas. See, e.g., 42 U.S.C. §§ 7473(b)(1) and 7475(d). Congress has declared visibility impairment prevention a national goal in federal Class I areas. See, e.g., 42 U.S.C. §§ 7491 and 7492. The National Park Service has conducted vegetation damage surveys in New Jersey's Class I area, the Edwin B. Forsythe National Wildlife Refuge. These surveys have revealed ozone injury to a wide variety of species in this area. Sulfates resulting from power plant emissions contribute to impaired visibility, negatively impacting Class I areas, including the Edwin B. Forsythe National Wildlife Refuge. The Brigantine Wilderness Area is a part of the Edwin B. Forsythe National Wildlife Refuge. The Community Modeling of Air Quality ("CMAQ") evaluation conducted by the State of Maryland demonstrates that Units 1 and 2 at the Portland Plant rank 36 and 82, respectively, in the list of the top 100 power plant units that contribute to sulfate emissions at the Brigantine Wilderness Area. See Garrison, Mark, "Development of Parallel CALPUFF Dispersion Modeling Platform for Sulfate Source Attribution Studies in the Northeast U.S," 2006.

## STATUTORY AND REGULATORY BACKGROUND

29.   The Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air in order to promote the public health and welfare and the productive capacity of the population. 42 U.S.C. § 7401(b)(1).

14

## THE NATIONAL AMBIENT AIR QUALITY STANDARDS

30.   Section 108(a) of the Act, 42 U.S.C. § 7408(a), requires the Administrator of the EPA to identify and prepare air quality criteria for each air pollutant, emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse sources.  For each such "criteria" pollutant, Section 109 of the Act, 42 U.S.C. § 7409, requires the EPA to promulgate regulations establishing primary and secondary NAAQS. The primary NAAQS must be adequate to protect the public health, and the secondary NAAQS must be adequate to protect the public welfare, from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air. Pursuant to Sections 108 and 109 of the Act, EPA has identified and promulgated NAAQS for various pollutants, including $SO_2$, $NO_2$, ozone and PM (measured in the ambient air as $PM_{10}$ and $PM_{25}$).  40 C.F.R. §§ 50.4-50.11.

31.   Under the Act, each state is required to submit to EPA for designation those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  42 U.S.C. § 7407(d).  An area that meets the NAAQS for a particular criteria pollutant or where there is insufficient data to make such a determination is termed an "attainment" area; an area that does not meet the NAAQS, or that

15

contributes to ambient air quality in a nearby area that does not meet the NAAQS, is termed a "nonattainment" area.  42 U.S.C. § 7407(d)(1)(A)( i) - (iii).   In redesignating an area, the Administrator may base its decision on air quality data, planning and control considerations, or any other air quality-related considerations that the Administrator deems appropriate.  42 U.S.C. § 7407(d)(1)(C)(3).

32.  In order to achieve its purposes, the Act also creates a federal/state partnership where each state is required to adopt a SIP that provides for the attainment and maintenance of the NAAQS. 42 U.S.C. § 7410.  The states are then required to submit the SIP to EPA for approval.  Id.  Each SIP must, e.g., contain emission limitations and contain adequate provisions prohibiting any source within a state from significantly contributing to the nonattainment of NAAQS of any other state.  42 U.S.C. § 7410(a)(2)(A) and (D).

33.  NAAQS for $PM_{2.5}$ were first set by EPA in 1997.  62 Fed. Reg. 38652 (July 18, 1997).  Also at this time, 24-hour NAAQS for $PM_{10}$, which were originally promulgated in 1987, were retained.  The $PM_{2.5}$ and $PM_{10}$ NAAQS were revised on October 17, 2006.  71 Fed. Reg. 6144.   Specifically, EPA tightened the 24-hour $PM_{2.5}$ standard, revising it to 35 micrograms per cubic meter.  Id.  On December 17, 2004, EPA set forth initial air quality designations and classifications for States for $PM_{2.5}$ NAAQS, see 70 Fed. Reg. 944. Air quality designations for the new more stringent 24-hour average

$PM_{2.5}$ NAAQS are due from EPA at the end of 2008. See www.epa.gov/oar/particlepollution/naaqsrev2006.html#timeline.

34.   NAAQS for primary 24 hour and secondary 3 hour $SO_2$ were promulgated in 1971 and have not changed since that time. 36 Fed. Reg. 8186 (April 28, 1971). NAAQS for $NO_2$ were also set at this time. Id.

35.   Pennsylvania is in attainment for $SO_2$, designated unclassifiable for $NO_2$ and designated unclassifiable/attainment for $PM_{2.5}$ and $PM_{10}$. 40 C.F.R. § 81.339. However, the Pennsylvania Department of Environmental Protection ("PADEP") has recommended to EPA that Northampton County--where the Portland plant is located --be designated nonattainment for the revised 24-hour average $PM_{2.5}$ NAAQS. See www.depweb.state.pa.us. Portions of Warren County, New Jersey (which is located directly across the Delaware River from the Portland Plant) are in nonattainment for $SO_2$. 13 counties in New Jersey are in nonattainment for $PM_{2.5}$. In addition to these 13 counties, the New Jersey Department of Environmental Protection ("NJDEP") is planning to recommend to EPA that Knowlton Township, Warren County, also be designated nonattainment for the revised 24-hour average $PM_{2.5}$ NAAQS. Knowlton Township is directly across the river from the Portland plant in Northampton County.

36.   More specifically, air quality modeling conducted by NJDEP shows that $SO_2$ emissions that can be emitted from the Plant,

17

even without contribution from any other emission source, violate the NAAQS for $SO_2$. NJDEP's modeling predicts that the Plant's current maximum permitted $SO_2$ emission rate (which does not reflect a BACT emission rate) results in violations of both the 3-hour and 24-hour $SO_2$ NAAQS in the vicinity of the Plant including locations in New Jersey. The modeling shows that the $SO_2$ emissions that Portland can emit cause a new $SO_2$ nonattainment area in Warren County, New Jersey. In addition, the modeling predicts that $PM_{2.5}$ and $SO_2$ (which converts to sulfate aerosols in the atmosphere) emissions that Portland can emit contribute to violations of the 24 hour $PM_{2.5}$ NAAQS. This will result in a new $PM_{2.5}$ nonattainment area in Knowlton Township, Warren County, New Jersey. Furthermore, the lack of limits on the amount of coal burned results in uncertain and essentially unlimited potential for increases in fine particulate emissions between infrequent stack tests, increasing the potential for an even larger $PM_{2.5}$ nonattainment area than predicted by New Jersey air quality modeling.

## PREVENTION OF SIGNIFICANT DETERIORATION

37.   Part C of subchapter I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as attaining NAAQS standards, or as unclassifiable. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the

18

preservation of existing clean air resources, to assure that emissions from one State will not interfere with another State's plan for the prevention of significant deterioration, and to effectuate these goals, assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision, including the interstate effects, and after public participation in the decision making process.   42 U.S.C. § 7470(1), (3), (4) & (5).   These provisions are referred to herein as the "PSD program."

38.   The PSD program is also intended "to preserve, protect and enhance the air quality in national parks, national wilderness areas . . . and other areas of special national or regional natural, recreational, scenic or historic value."   42 U.S.C. § 7470(2).   Certain procedures must be followed with regard to potential impact on Class I areas from a proposed source or source that will undergo a modification as defined in the CAA.   Under 42 U.S.C. § 7475(d)(2)(A)-( C), EPA must provide notice of the PSD permit application to the federal official charged with responsibility for management of any lands within a Class I area that may be affected by emissions from the proposed facility or modification, the Federal Land Manager ("FLM").

39.   The FLM must then make a determination whether the proposed project will adversely impact air quality related values (including visibility) on any land within the Class I area.   In any

19

case where the FLM files a notice alleging that emissions from a proposed project may cause or contribute to a change in the air quality in such area and identifying the potential adverse impacts of such change, a permit shall not be issued unless the owner or operator of such facility demonstrates that emissions of PM and $SO_2$ will not cause or contribute to concentrations that exceed the maximum allowable emission increases for a Class I area. 42 U.S.C. § 7475(d)(2)( c).

40.    The Act further mandates that the construction or "modification" of a "major emitting facility" in an area designated as attainment cannot take place unless a PSD permit has been issued. 42 U.S.C. §§ 7475(a); 7479. In addition, no construction or modification of such a facility can take place until the owner or operator demonstrates "that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (B) national ambient air quality standard in any air quality control region, or ( c) any other applicable emission standard or standard of performance under this chapter." 42 U.S.C. § 7475(a)(3).    In addition, no construction or modification of a major emitting facility may take place until the proposed facility is subject to BACT for each pollutant that is emitted by the facility and that is

20

subject to regulation under the Act. _Id._ at (a)(4). "Major emitting facility" is defined to include, _inter alia_, any fossil-fuel fired steam electric plant with a heat input of more than 250 million British thermal units per hour (250 mmBtu/hr) that emits or has the potential to emit 100 tpy or more of any air pollutant. 42 U.S.C. § 7479(1). "Modification" is defined under 42 U.S.C. § 7411(a)(4), _see_ _also_ 42 U.S.C. § 7479(2)( c), as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."

41.   Section 161 of the Act, 42 U.S.C. § 7471, requires that each SIP contain emission limitations and such other measures as may be necessary, as determined under the regulations promulgated pursuant to these provisions, to prevent significant deterioration of air quality in attainment areas.

42.   A state may comply with Sections 110(a) and 161 of the Act by being delegated by EPA the authority to implement the federal PSD regulations set forth at 40 C.F.R. § 52.21, or by having its own PSD regulations approved as part of its SIP by EPA, which cannot be less stringent than those set forth at 40 C.F.R. § 51.166, _see_ 42 U.S.C. § 7416.

43.   In order to implement the PSD program created by the Act, EPA promulgated regulations in 1980, 45 Fed. Reg. 52676 (August 7,

1980) at 40 C.F.R. § 52.21.  EPA revised, in part, the PSD regulations in 1992. 57 Fed. Reg. 32314 (July 21, 1992). Although EPA finalized revisions to the PSD regulations on December 31, 2002, see 67 Fed. Reg. 80186, these PSD rule revisions do not apply retroactively.  See, e.g., Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988).  EPA has also proposed a series of further revisions to PSD, see 70 Fed. Reg. 61081 (October 20, 2005), 71 Fed. Reg. 54235 (September 14, 2006), and 72 Fed. Reg. 26202 (May 8, 2007), but EPA has not finalized these rules. Finally, the PSD rule revisions at 68 Fed. Reg. 61248 (October 27, 2003) were vacated by the Circuit Court of Appeals for the D.C. Circuit on March 17, 2006. See State of New York v. EPA, 443 F.3d 880 (D.C. Cir. 2006).  Therefore, the 1980 regulations are applicable to the "modifications" set forth in this Complaint that took place at Portland prior to July 21, 1992 and the 1992 PSD regulations are applicable to "modifications" that took place after July 21, 1992. In general, the regulations referred to herein refer to the 1980 regulations.

44.   The regulations also prohibit the construction or "major modification" of a major stationary source in any attainment area unless a PSD permit has been issued that satisfies the requirements of the regulations.   40 C.F.R. §§ 52.21( j), 52.21(j)- ( r). Mirroring the Act, the regulations define the term "major stationary source" to include, inter alia, any fossil-fuel fired

22

steam electric plant of more than 250 million Btu/hr that emits or has the potential to emit 100 tpy or more of any air pollutant subject to regulation under the Act.  40 C.F.R. § 52.21(b)(1)(i).

45.  "Major modification" is defined at 40 C.F.R. § 52.21(b)(2)(i) as any physical change or change in the method of operation of a major stationary source that would result in a "significant" net emissions increase of any pollutant subject to regulation under the Act.  "Significant" is defined at 40 C.F.R. § 52.21(b)(23)((i) "in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates": for $NO_2$ and $SO_2$, 40 tpy, for PM, 25 tpy, and currently for $PM_{10}$, 15 tpy.  EPA has proposed a $PM_{2.5}$ significant emission increase rate of 10 tpy, but EPA has not yet promulgated a level.

46.  "Net emissions increase" means "the amount by which the sum of the following exceeds zero: (a) any increase in actual emissions (as defined by 40 C.F.R. § 52.21(b)(21)) from a particular physical change or change in method of operation at a stationary source; and (b) any other increases and decreases in actual emissions (as defined by 40 C.F.R. § 52.21(b)(21) to mean "the actual rate of emissions of a pollutant from an emissions unit") at the source that are contemporaneous with the particular change and are otherwise creditable." 40 C.F.R. § 52.21(b)(3)(i).

47.  As set forth at 40 C.F.R. § 52.21(j), see also 42 U.S.C.

23

§ 7475(a)(4), a source undertaking a major modification in an attainment area must install and operate BACT for each pollutant subject to regulation under the Act for which the modification would result in a significant net emissions increase. BACT is the maximum degree of emission reduction achievable for each pollutant regulated under the Act, taking into consideration energy, environmental, and economic impacts of the emission reductions. 40 C.F.R. § 52.21(b)(12). See also 42 U.S.C. § 7479(3).

48. To ensure that the major modification does not result in a violation of the NAAQS, the regulations require that the facility perform air quality modeling and analysis of resulting emissions. As set forth in 40 C.F.R. §§ 52.21(k) and 52.21 (l), the PSD program requires a person who wishes to modify a major source in an attainment area to demonstrate, before construction commences, that the construction will not cause or contribute to a violation of any ambient air quality standard in any air quality region or any allowable pollution increment in any area.

49. Pursuant to 40 C.F.R. § 52.21(p), notification of any permit application for a proposed major source or modification with emissions that may affect a Class I area must be provided to the FLM for that area by the Administrator. A permit may not be issued if adverse impacts on air quality related values (including visibility) for the Class I area would occur. Id.

## PENNSYLVANIA PSD/SIP REGULATIONS

50. The requirements of the federal PSD regulations at 40 C.F.R. § 52.21 have been incorporated by reference into the federally enforceable SIP for Pennsylvania, as set forth at 40 C.F.R. § 52.2058. EPA approved Pennsylvania's SIP to include the provisions of § 52.21 in 1984. See 49 Fed. Reg. 33127 (August 21, 1984); 40 C.F.R. § 52.2023. The federal PSD regulations require a person who intends to construct or undertake a "major modification" at a major emitting facility in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified PSD increment amount. 40 C.F.R. § 52.21(k). These regulations also prohibit the construction or "major modification" of a major stationary source in any attainment area unless a PSD permit has been issued that satisfies the requirements of the regulations. 40 C.F.R. §§ 52.21( i), 52.21(j)-( r). Pennsylvania has adopted in its entirety the federal PSD regulations at 40 C.F.R. § 52.21, see 25 Pa. Code 127.83, and consequently, the federal permit and ambient air quality requirements.

51. Pennsylvania has adopted, and EPA has approved, effective October 22, 1984, state regulations for the implementation of a state PSD program found at 25 Pa. Code § 127.83.

52. Prior to approval of the Pennsylvania PSD regulations, the federal PSD regulations, found at 40 C.F.R. § 52.21 et seq.,

25

were applicable to facilities located in Pennsylvania.

## PENNSYLVANIA'S TITLE V PROGRAM

53.   Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources."  "Major source" is defined, see 42 U.S.C. § 7661(2), to include "a major stationary source" as defined pursuant to 42 U.S.C. § 7602(z).  Each permit issued under Title V is to include enforceable emission limitations and standards and a schedule for compliance to ensure compliance with all "applicable requirements" of the Act.  42 U.S.C. § 7661c(a).  Pursuant to 40 C.F.R. § 70.2, "applicable requirements" are defined to include, inter alia, any standard set forth in a SIP, any term or condition of a PSD permit, and any NAAQS and PSD increments.

54.   EPA approved Pennsylvania's Title V operating permit program effective August 29, 1996.  61 Fed. Reg. 39597 (July 30, 1996).  Pennsylvania's Title V operating permit program is set forth at 25 Pa. Code § 127.501 et seq.  Section 504(a) of the Act, 42 U.S.C. § 7661c(a), the implementing regulations of the Act, 40 C.F.R. § 70.2, and the Pennsylvania Title V operating permit program regulations, 25 Pa. Code § 127.512, require that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the Act and the requirements of the applicable SIP, including any applicable PSD

26

requirement to comply with an emission rate that meets BACT and air quality modeling to demonstrate that emissions do not cause or contribute to a violation of any NAAQS or PSD increment. A source operating in violation of applicable requirements must include a schedule for compliance with those requirements in its Title V permit application. 25 Pa. Code § 127.503(8)(iii).

55.   Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and the Pennsylvania Title V operating permit program, 25 Pa. Code § 127.512, have at all relevant times made it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a "major source" except in compliance with a permit issued by a permitting authority under Title V.

56.   The Pennsylvania Title V operating permit program regulations, 25 Pa. Code § 127.503, further require that a source submit a complete application which, among other things, identifies all applicable requirements, certifies compliance with all applicable requirements, and contains a compliance plan for all applicable requirements for which the source is not in compliance. In addition, a Title V permit application shall "[s]how that the source will not prevent or adversely affect the attainment or maintenance of ambient air quality standards when requested by the Department." 25 Pa. Code 127.12(6).

**CLEAN AIR ACT ENFORCEMENT PROVISIONS**

57.    Pursuant to 42 U.S.C. § 7604(a)(1), any person may commence in the United States District Courts a suit against any person "alleged to have violated (if there is evidence that the alleged violation is repeated) or to be in violation of . . . an emission standard or limitation under the Act." The term "emission standard or limitation" includes: (1) an emission limitation or standard; any condition or requirement of a PSD permit, any permit term or condition in a permit issued pursuant to Title V of the Act, "and any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604 (f)(1), (3), & (4). Under 42 U.S.C. § 7604(a)(3), any person may file suit in federal district court against any person who undertakes a major modification of a major emitting facility without first obtaining a PSD permit. No notice must be provided before the commencement of a suit pursuant to 42 U.S.C. § 7604(a)(3). See 42 U.S.C. § 7604(b).

58.    42 U.S.C. § 7602(e) defines "person" to include, *inter alia*, an individual, a corporation, a State or a political subdivision of a State. New Jersey and each of the Defendants are "persons" within the meaning of 42 U.S.C. § 7602(e).

59.    42 U.S.C. § 7604(a) authorizes both injunctive relief and civil penalties.

### FACTS COMMON TO ALL CAUSES OF ACTION

60.    Defendants own and operate, and at all relevant times

28

under this Complaint owned and operated, the Portland Plant located in Upper Mt. Bethel Township, Northampton County, Pennsylvania.

61. Portland includes five electricity generating units. Units 1 and 2 each consist of one coal-fired boiler and one steam turbine and Units 3, 4 and 5 each consist of a combustion turbine that burns natural gas or oil. Unit 1 was placed into service in 1958 and has a reported electrical generating capacity of 158 MW. Unit 2 was placed into service in 1962 and has a reported electrical generating capacity of 242 MW. Unit 3 was placed into service in 1967 and has a reported electrical generating capacity of 15 MW. Unit 4 was placed into service in 1971 and has a reported electrical generating capacity of 22 MW. Unit 5 was placed into service in 1994 and has a reported electrical generating capacity of 150 MW.

62. At the time that Defendants constructed Portland, and at the time that the federal PSD regulations became effective on August 7, 1980, the source had the potential to emit in excess of 100 tpy each of $NO_x$, $SO_2$ and PM.

63. Portland is, and was at the time that Defendants made the modifications and undertook the construction identified in this Complaint, a "major emitting facility" within the meaning of 42 U.S.C. § 7479(1) and a "major stationary source" for $SO_2$, $NO_x$ (which is a part of $NO_x$) and PM within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(b). See also 42 U.S.C. § 7602(z).

29

64.   A March 1994 permit from PADEP for Unit 5 included, as a condition of approval, 24-hour and annual heat input operational limitations on Units 1 and 2 that reflected a reduction in Unit 1 and 2's 1992-1993 annual average actual operating levels sufficient to net out of NOx and $PM_{10}$ emission increases from construction of Unit 5.   In or around June 1996, PADEP issued a permit for the Portland Plant that eliminated the operating restrictions on Units 1 and 2.

65.   In or around January, 2000, PADEP issued a Title V Operating Permit to Defendants for the operation of the Portland Plant ("operating permit").  The operating permit contained various conditions, limitations, and other requirements for operation of the Portland plant.   Portland's operating permit was issued pursuant to the Pennsylvania Air Pollution Control Act, 35 P.S. § 4001 et seq., and 25 Pa. Code 127.   The operating permit listed heat input capacities as 1,657.20 million BTU/hr for Unit No. 1 and 2,511.60 million BTU/hr for Unit No. 2.   On June 8, 2005, PADEP released for public comment a revised draft operating permit for the Portland Plant.   The proposed permit, which was marked "unofficial," was sent to EPA on or about May 24, 2006 ("Unofficial Title V Permit").   The Unofficial Title V Permit for Portland similarly listed the rated heat input limits of Portland's Units 1 and 2 as 1,657.2 and 2,511.6 mmBTU/Hr respectively.   These heat rate capacities were included in both the "Facility/Source

30

Identification" section of the Unofficial Title V Permit, as well as the "Site Level Title V Requirements" section.

## FIRST CLAIM FOR RELIEF

### (Unit 1- First Physical Changes)

66.  Plaintiff repeats and realleges the preceding paragraphs as if fully incorporated herein.

67.  At various times since the effective date of the PSD regulations, Defendants commenced construction of modifications and major modifications, as defined herein, on Unit 1 at Portland.

68.  Between 1983 and 1989, Defendants replaced, *inter alia*, approximately 1,000 waterwall and waterwall slope tubes at a cost of over $8,000,000 at Unit 1.  These major construction projects ("first Unit 1 physical changes") were conducted during annual planned outages occurring:

> 10/3/1983 to 12/2/1983;
> 2/18/1985 to 4/27/1985;
> 3/31/1986 to 6/25/1986;
> 4/6/1987 to 5/8/1987;
> 9/19/1988 to 12/24/1988; and
> 3/20/1989 to 5/14/1989.

69.  Based upon information obtained as of the filing of this Complaint, these projects and/or other projects set forth in this Complaint, individually and/or collectively, resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_x$ and potentially in a net increase of more than 15 tpy of $PM_{10}$ and $PM_{2.5}$.

70.  These projects and/or other projects set forth in this Complaint, individually and/or collectively, were modifications

32

pursuant to 42 U.S.C. § 7411(a)(4) and were major modifications
within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code
127.83.   Thus, Defendants were required to obtain a PSD permit
before  commencing  construction  of  these  modifications,  and
otherwise comply with the PSD requirements.

71.   Defendants did not apply for or obtain a PSD permit for
the first Unit 1 physical changes in violation of 42 U.S.C. § 7475
and 40 C.F.R. § 52.21.

72.   Before constructing the first Unit 1 physical changes,
Defendants  failed  to  demonstrate  that  the  emissions  increases
resulting from the modifications would not cause or contribute to
air pollution in excess of any maximum allowable increase or
maximum allowable concentration for any pollutant or any NAAQS in
any  air  quality  region  pursuant  to  42  U.S.C.  §  7475
(preconstruction requirements) or to otherwise comply with any
substantive requirements of 40 C.F.R. § 52.21(j) through ( r).
Further, NJDEP's modeling predicts that the Plant's current maximum
permitted $SO_2$ emission rate (which does not reflect a BACT emission
rate) results in violations of both the 3-hour and 24-hour $SO_2$
NAAQS in the vicinity of the Plant including locations in New
Jersey.

73.   Defendants have not implemented BACT for reducing $SO_2$, $NO_2$
and PM emissions from Unit 1 as required by 42 U.S.C. § 7475(a)(4).

33

74.    Since commencing construction of the first Unit 1 physical changes, Defendants have been in violation of 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21 and 25 Pa. Code 127.83.

75.    Upon information and belief, subject to further investigation and discovery, Defendants may have made other modifications as defined by the PSD regulations to Unit 1.

76.    These violations of the Clean Air Act, the implementing regulations and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### SECOND CLAIM FOR RELIEF
### (Unit 1- Second Physical Changes)

77.    Plaintiff repeats and realleges the preceding paragraphs as if fully incorporated herein.

78.    Defendants again modified Unit 1 between 1982 and 1986 by replacing the entire high temperature superheater outlet header in 1986, after replacing 35 outlet header nipples in 1982, and, also in 1986, replacing 54 tubes in the radiant economizer ("second Unit 1 physical changes").    These modifications occurred during the planned outages in the Fall of 1982 and the Spring of 1986.

79.    Based upon information obtained as of the filing of this complaint and belief, these projects and/or other projects set forth in this Complaint, individually and/or collectively, resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_x$.

34

80.   These projects and/or other projects set forth in this Complaint, individually and/or collectively, were modifications within the meaning of 42 U.S.C. § 7411(a)(4) and were major modifications within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code 127.83.   Thus, Defendants were required to obtain a PSD permit before commencing construction of the modifications and otherwise comply with the PSD requirements.

81.   Defendants did not apply for or obtain a PSD permit for the second Unit 1 physical changes in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21.

82.   Before constructing the second Unit 1 physical changes, Defendants failed to demonstrate that the emissions increases resulting from the modifications would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 (preconstruction requirements) or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through (r). Further, NJDEP's modeling predicts that the Plant's current maximum permitted $SO_2$ emission rate (which does not reflect a BACT emission rate) results in violations of both the 3-hour and 24-hour $SO_2$ NAAQS in the vicinity of the Plant including locations in New Jersey.

83.   Defendants have not implemented BACT for reducing $SO_2$ and

$NO_2$ emissions from Unit 1 as required by 42 U.S.C. § 7475(a)(4).

84.    Since commencing construction of the second Unit 1 physical changes, Defendants have been in violation of 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21 and 25 Pa. Code 127.83.

85.    Upon information and belief, subject to further investigation and discovery, Defendants may have made other modifications as defined by the PSD regulations to Unit 1.

86.    These violations of the Clean Air Act, the implementing regulations and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### THIRD CLAIM FOR RELIEF
#### (Unit 1- Third Physical Changes)

87.    Plaintiff repeats and realleges the preceding paragraphs as if fully incorporated herein.

88.    Defendants again modified Unit 1 in 1992 by replacing additional boiler waterwall tubes ("third Unit 1 physical changes").

89.    Based upon information obtained as of the filing of this Complaint and belief, these projects and/or other projects set forth in this Complaint, individually and/or collectively, resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_x$, and potentially in a net increase of more than 15 tpy of $PM_{10}$ and $PM_{2.5}$.

36

90.   These projects and/or other projects set forth in this Complaint, individually and/or collectively, were modifications within the meaning of 42 U.S.C. § 7411(a)(4) and were major modifications within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code 127.83.   See also 40 C.F.R. § 52.21 (1992).   Thus, Defendants were required to obtain a PSD permit before commencing construction of the modifications and otherwise comply with the PSD requirements.

91.   Defendants did not apply for or obtain a PSD permit for the third Unit 1 physical changes in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21.   See also 40 C.F.R. § 52.21 (1992).

92.   Before constructing the third Unit 1 physical changes, Defendants failed to demonstrate that the emissions increases resulting from the modifications would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 (preconstruction requirements) or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through ( r). See also 40 C.F.R. § 52.21 (1992).   Further, NJDEP's modeling predicts that the Plant's current maximum permitted $SO_2$ emission rate (which does not reflect a BACT emission rate) results in violations of both the 3-hour and 24-hour $SO_2$ NAAQS in the vicinity of the Plant including locations in New Jersey.

37

93.   Defendants have not implemented BACT for reducing $SO_2$, $NO_x$ and PM emissions from Unit 1 as required by 42 U.S.C. § 7475(a)(4)).

94.   Since commencing construction of the second Unit 1 modification, Defendants have been in violation of 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21 and 25 Pa. Code 127.83.

95.   Upon information and belief, subject to further investigation and discovery, Defendants may have made other modifications as defined by the PSD regulations to Unit 1.

96.   These violations of the Clean Air Act, the implementing regulations and the Pennsylvania regulations will continue unless restrained by an order of this Court.

## FOURTH CLAIM FOR RELIEF
### (Unit 2 -First Physical Changes)

97.   Plaintiff repeats and realleges the preceding paragraphs as if fully incorporated herein.

98.   At various times since the effective date of the PSD regulations, Defendants commenced construction of modifications and major modifications, as defined herein, on Unit 2 at Portland.

99.   Between 1980 and 1989, Defendants modified Unit 2 by replacing the major portions of the waterwall and the waterwall slope tubes at a cost in excess of $8,000,000.  Major construction projects ("first Unit 2 physical changes") were conducted during

annual planned outages at the Plant, including:

> Boiler Tube Replacement, 1980;
> Waterwall Tube Replacement, 1982;
> "Boiler" work, 1983;
> Slope Tubes and Wall Tubes Replacement, 1985;
> Boiler Tube Replacement, 1987;
> Boiler Tube Replacement, 1989;
> Slope Tube Replacement, 1980;
> Slope Tube Replacement, 1982; and
> Slope Tube Replacement, 1989.

100.   These projects and/or other projects set forth in this Complaint, individually and/or collectively, resulted in a net emissions increase of more than 40 tpy for both $NO_x$ and $SO_x$.

101.   These projects and/or other projects set forth in this Complaint, individually and/or collectively, were modifications within the meaning of 42 U.S.C. § 7411(a)(4) and were major modifications within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code 127.83.   Thus, Defendants were required to obtain a PSD permit before commencing construction of the modifications and otherwise comply with the PSD requirements.

102.   Defendants did not apply for or obtain a PSD permit for the first Unit 2 physical changes in violation of 42 U.S.C. 7475 and 40 C.F.R. § 52.21.

103.   Before constructing the first Unit 2 physical changes, Defendants failed to demonstrate that the emissions increases resulting from the modifications would not cause or contribute to

39

air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 (preconstruction requirements) or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through ( r). Further, NJDEP's modeling predicts that the Plant's current maximum permitted $SO_2$ emission rate (which does not reflect a BACT emission rate) results in violations of both the 3-hour and 24-hour $SO_2$ NAAQS in the vicinity of the Plant including locations in New Jersey.

104. Defendants have not implemented BACT for reducing $SO_2$ and $NO_x$ emissions from Unit 2 as required by 42 U.S.C. § 7475(a)(4).

105. Since commencing construction of the first Unit 2 physical changes, Defendants have been in violation of 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21 and 25 Pa. Code 127.83.

106. Upon information and belief, subject to further investigation and discovery, Defendants may have made other modifications as defined by the PSD regulations to Unit 2.

107. These violations of the Clean Air Act, the implementing regulations and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### FIFTH CLAIM FOR RELIEF
### (Unit 2 - Second Physical Changes)

40

108. Plaintiff repeats and realleges the preceding paragraphs as if fully incorporated herein.

109. Defendants again modified Unit 2 between 1980 and 1989 by replacing substantial portions of the reheater section of the boiler during three planned outages ("second Unit 2 physical changes"). For example, in 1982, one half of the front section of the reheater was replaced with stainless steel tubes. These major construction projects were conducted during annual planned outages including:

> Reheater Tube Replacement, 1980;
> Reheater Replacement, 1982; and
> Reheater Loop Replacement, 1989.

110. Based upon information obtained as of the filing of this Complaint and belief, these projects and/or other projects set forth in this Complaint, individually and/or collectively, resulted in a net emissions increase of more than 40 tpy for $SO_2$.

111. Each of the projects and/or other projects set forth in this Complaint, individually and/or collectively, was a major modification within the meaning of 40 C.F.R. § 52.21(b)(2) and/or 25 Pa. Code 127.83. Thus, Defendants were required to obtain a PSD permit prior to commencing construction of the modification and otherwise comply with the PSD requirements.

112. Defendants did not apply for or obtain a PSD permit for the second Unit 2 physical changes in violation of 42 U.S.C. § 7475

41

and 40 C.F.R. § 52.21.

113.   Before constructing the second Unit 2 physical changes, Defendants failed to demonstrate that the emissions increases resulting from the modification would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 (preconstruction requirements) or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through ( r). Further, NJDEP's modeling predicts that the Plant's current maximum permitted $SO_2$ emission rate (which does not reflect a BACT emission rate) results in violations of both the 3-hour and 24-hour $SO_2$ NAAQS in the vicinity of the Plant including locations in New Jersey.

114.   Defendants have not implemented BACT for reducing $SO_2$ emissions from Unit 2 as required by 42 U.S.C. § 7475(a)(4).

115.   Since commencing construction of the second Unit 2 physical changes, Defendants have been in violation of 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21 and 25 Pa. Code 127.83.

116.   Upon information and belief, subject to further investigation and discovery, Defendants may have made other major modifications as defined by the PSD regulations to Unit 2.

117.  These violations of the Act, the implementing regulations

42

and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### SIXTH CLAIM FOR RELIEF
### (Unit 2 - Third Physical Changes)

118.  Plaintiff repeats and realleges the preceding paragraphs as if fully incorporated herein.

119.  Defendants again modified Unit 2 in 1995 by replacing the entire platen and pendant superheater headers as well as the associated pendant superheater tubes   ("third Unit 2 physical changes").

120.  Based upon information obtained as of the filing of this Complaint and belief, these projects and/or other projects set forth in this Complaint, individually and/or collectively, resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_x$.

121.  Each of the projects and/or other projects set forth in this  Complaint,  individually  and/or  collectively,  was  a modification within the meaning of 42 U.S.C. § 7411(a) and a major modification within the meaning of 40 C.F.R. § 52.21(b)(2) and/or 25 Pa. Code 127.83.  Thus, Defendants were required to obtain a PSD permit prior to commencing construction of the modifications and otherwise comply with the PSD requirements.

122.  Defendants did not apply for or obtain a PSD permit for

the third Unit 2 physical changes in violation of 42 U.S.C. 7475 and 40 C.F.R. § 52.21.

123.   Before constructing the third Unit 2 physical changes, Defendants failed to demonstrate that the emissions increases resulting from the modifications would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 (preconstruction requirements) or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through ( r ). Further, NJDEP's modeling predicts that the Plant's current maximum permitted $SO_2$ emission rate (which does not reflect a BACT emission rate) results in violations of both the 3-hour and 24-hour $SO_2$ NAAQS in the vicinity of the Plant including locations in New Jersey.

124.   Defendants have not implemented BACT for reducing $SO_2$ and $NO_x$ emissions from Unit 2 as required by 42 U.S.C. § 7475(a)(4).

125.   Since commencing construction of the third Unit 2 physical changes, Defendants have been in violation of 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21 and 25 Pa. Code 127.83.

126.   Upon information and belief, subject to further investigation and discovery, Defendants may have made other major

44

modifications as defined by the PSD regulations to Unit 2.

127.   These violations of the Clean Air Act, the implementing regulations and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### SEVENTH CLAIM FOR RELIEF
### (Unit 1 - Operating Permit Violations)

128.   Plaintiff repeats and realleges the preceding paragraphs as if fully incorporated herein.

129. Portland's operating permits contained various conditions, limitations, and other requirements for operation of the Portland plant.   Portland's operating permit was issued pursuant to the Pennsylvania Air Pollution Control Act, 35 P.S. § 4001 et seq., and 25 Pa. Code 127.

130.   On May 29, 2003, PADEP issued a revised Title V permit to Defendants for the operation of the Portland Plant (the "Portland Title V permit").   The Portland Title V permit contains various conditions, limitations, and other requirements for operations of the Portland plant.

131. At various times, Defendants have operated, and continue to operate, Portland Unit No. 1 without complying with the PSD requirements of the Act and the implementing regulations.   In addition, Defendants have failed to submit a complete operating permit application which, among other things, identified all

45

applicable requirements (including PSD), certified compliance with all applicable requirements, and contained a compliance plan for all applicable requirements for which the source is not in compliance as required by Title V of the Act and the Pennsylvania regulations implementing Title V. The application for the operating permit further does not demonstrate that the source does not adversely affect the attainment or maintenance of ambient air quality standards. Unless restrained by an order of this Court, these and similar violations will continue.

### EIGHTH CLAIM FOR RELIEF
### (Unit 2 - Operating Permit Violations)

132. Plaintiff repeats and realleges the preceding paragraphs as if fully incorporated herein.

133. At various times, Defendants have operated, and continue to operate, Portland Unit No. 2 without complying with the PSD requirements of the Act and the implementing regulations. In addition, Defendants have failed to submit a complete operating permit application which, among other things, identified all applicable requirements (including PSD), certified compliance with all applicable requirements, and contained a compliance plan for all applicable requirements for which the source is not in compliance as required by Title V of the Act and the Pennsylvania rules implementing Title V. The application for the operating permit further does not demonstrated that the source does not

46

adversely affect the attainment or maintenance of ambient air quality standards.  Unless restrained by an order of this Court, these and similar violations will continue.

### PRAYER FOR RELIEF

WHEREFORE, New Jersey requests that this Court:

A.    Permanently enjoin Defendants from operating Portland except in accordance with the Act, the federal PSD regulations, the applicable Pennsylvania regulations, and the applicable SIP;

B.    Order Defendants to remedy its past violations;

C.    Order Defendants to take other appropriate actions to remedy, mitigate, or offset the harm to public health and the environment caused by the violations of the Act alleged above and requiring Defendants to install and operate BACT at the Portland Plant for each pollutant subject to regulation under the Act and demonstrate that emissions from the Portland Plant do not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality control region;

D.    Order Defendants to apply for permits that are in conformity with the requirements of the PSD, Title V and Pennsylvania programs;

E.    Order Defendants to conduct audits of its operations to determine if any additional modifications have occurred that are

not included in this Complaint which would require Defendants to meet the requirements of PSD, Title V and the Pennsylvania statutes and regulations, and report the results of these audits to New Jersey;

F.   Assess an appropriate civil penalty against Defendants;

H.   Award New Jersey their costs of this action (including expert witness fees) and reasonable attorney fees pursuant to 42 U.S.C. § 7604(d); and

I.   Grant such other relief as the Court deems just and proper.

DATED: *18 DEC 2007*

Respectfully submitted,

ANNE MILGRAM

ATTORNEY GENERAL OF NEW JERSEY

Timothy P. Crowley (58758)

Deputy Attorney General
Richard J. Hughes Justice Complex

25 Market Street

P.O. Box 093

Trenton, New Jersey 08625-0093

(609)292-6945

fax: (609) 984-9315

tim.crowley@lps.state.nj.us

45