RICHARD BLUMENTHAL
ATTORNEY GENERAL OF CONNECTICUT
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Attorney for Plaintiff State of Connecticut


By:    Scott N. Koschwitz
       Assistant Attorney General
       (860) 808-5250

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STATE OF NEW JERSEY AND<br>STATE OF CONNECTICUT,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>RELIANT ENERGY MID-ATLANTIC POWER<br>HOLDINGS, LLC, RELIANT ENERGY POWER<br>GENERATION, INC., SITHE ENERGIES, INC.<br>n/k/a DYNEGY, INC., AND<br>METROPOLITAN EDISON CO.<br><br>　　　Defendants. | ）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>）<br>） | Civil Action No.<br>5:07-cv-05298 (JKG)<br><br><br>**FIRST AMENDED COMPLAINT** |

The State of Connecticut ("Connecticut"), represented by, and by authority of, the

Attorney General of the State of Connecticut, alleges:

## NATURE OF THE ACTION

1.    Pursuant to 42 U.S.C. § 7604(a)(1) and (a)(3), Connecticut maintains this civil

action against Reliant Energy Power Generation, Inc., Reliant Energy Mid-Atlantic Power

Holdings, LLC, (collectively "Reliant"), Sithe Energies, Inc. ("Sithe"), and Metropolitan Edison

Co. ("Metropolitan Edison"), collectively referred to as the "Defendants," based on their

modification and continued operation of a major emitting facility, the Portland Generating Station (the "Portland Plant"), without the permits and pollution controls required by Part C of Title I of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7470-7479 (the Prevention of Significant Deterioration ("PSD") provisions), the Pennsylvania State Implementation Plan, which incorporates the federal PSD program at 40 C.F.R. Part 52, Subpart NN, §§ 52.2020 through 52.2063, including §§ 52.2058 and 52.2023, and the Title V provisions of the Act, 42 U.S.C. §§ 7661 *et seq.* and implementing regulations, 40 C.F.R. §§ 70.1 *et seq.*

2.        Reliant owns and operates, and Metropolitan Edison and Sithe owned and operated, the Portland Plant, a coal-fired power plant located in Upper Mount Bethel Township, Northampton County, Pennsylvania.  As a byproduct of the production of electricity and as a result of its operations, the Portland Plant emits air pollutants, including but not limited to sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), including nitrogen dioxide ($NO_2$), a form of nitrogen oxide ($NO_x$), and particulate matter ("PM").  These pollutants are associated with a plethora of adverse environmental impacts from their contribution to acid rain, to the formation and creation of ozone and fine particulate matter ("$PM_{2.5}$"), and adverse health impacts such as the exacerbation of respiratory illnesses.  Prevailing winds carry these air pollutants from the Portland Plant to Connecticut, where they have caused harm, and continue to cause harm, to Connecticut's air quality, citizens, and environment.  At the Portland Plant, the Defendants undertook modifications, as defined by the Act, of the physical plant that have resulted in increased emissions of $SO_2$, $NO_2$, and PM, but failed to undergo the preconstruction review required under the PSD provisions of the Act, 42 U.S.C. §§ 7470-7479, that would have required, *inter alia*, the installation of pollution control equipment designed to minimize air pollutants and an analysis of any impact on ambient air quality and PSD increments.  The Defendants have also violated PSD

2

and the Title V provisions of the Act based on their prior, current, and continued operation of the Portland Plant without complying with the PSD or Title V provisions.

3.     At no time did the Defendants apply for or obtain the preconstruction permits required under the PSD provisions of the Act, 42 U.S.C. § 7475, and their implementing regulations or any equivalent state program and, consequently, the Defendants have operated, and continue to operate, the Portland Plant without applying best available control technology ("BACT") to control emissions as required by the PSD provisions and Title V provisions. *Id.*; 42 U.S.C. § 7661a.   As a result, excessive amounts of $SO_2$, $NO_x$, $NO_2$ and PM have been, and still are being, emitted into the atmosphere from the Portland Plant, which have harmed and continue to harm Connecticut's resources and citizens.

4.     Connecticut in this action seeks, *inter alia*, (a) an injunction prohibiting further operation of the Portland Plant except in accordance with the Act and implementing federal and state regulations, including implementation of BACT; (b) civil penalties for the Defendants' past and ongoing violations of the Act; and (c) mitigation of the harm caused by the Defendants' illegal emissions.

### JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. §§ 7604(a) and 7477, 28 U.S.C. §§ 1331 and 1355, and supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in this District pursuant to Section 304(c) of the Act, 42 U.S.C. § 7604(c), and pursuant to 28 U.S.C. § 1391, because the violations occurred and are occurring in this District, and because the Portland Plant, the subject of this First Amended Complaint, is located within this District.

7. Although advance notice is not required before commencing a civil action pursuant to 42 U.S.C. § 7604(a)(3), before Connecticut filed its motion to intervene on October 31, 2008, and the court granted such motion on March 24, 2009, plaintiff New Jersey provided notice on November 16, 2005, via certified mail, to Reliant Energy Mid-Atlantic Power Holdings, LLC, Reliant Energy Power Generation, Inc., Reliant Energy, Inc., Centerpoint Energy, Sithe Energies, Inc., Metropolitan Edison Co., and GPU, Inc. and relevant federal and state officials, of its intent to file an action against the Defendants for violations of the federal PSD and Title V requirements and implementing regulations at the Portland Plant should the violations not be addressed. (New Jersey sent this notice via certified mail to a corrected address to Reliant Energy Mid-Atlantic Power Holdings, LLC on December 2, 2005). More than sixty days have elapsed since New Jersey provided this notice. New Jersey also provided notice on August 27, 2008 to Reliant and Sithe with respect to additional modifications undertaken by Sithe and/or Reliant at the Portland Plant as set forth in this First Amended Complaint. More than sixty days have elapsed since New Jersey provided this notice. In addition, the United States Environmental Protection Agency ("EPA") has not commenced a civil action against the Defendants for the violations set forth in this First Amended Complaint. *See* 42 U.S.C. § 7604(b)(1)(B).

## THE PLAINTIFF

8. Connecticut is a body politic and sovereign entity which brings this action on behalf of itself and, as *parens patriae,* on behalf of all residents and citizens of the State. Connecticut has responsibility for abating air pollution. *See, e.g.*, 42 U.S.C. § 7410. Connecticut's responsibilities include implementation of the Act generally, and the Act explicitly preserves to states the right to enforce any state common law remedy. 42 U.S.C. §§ 7401, 7604(e).

4

## THE DEFENDANTS

9.      Upon information and belief, Reliant Energy Mid-Atlantic Power Holdings LLC

("Reliant Energy Mid-Atlantic"), formerly Sithe Pennsylvania Holdings, LLC, and Reliant Energy

Power Generation, Inc. are the current owners and operators of the Portland Plant and have owned

and operated the Portland Plant since May 2000, when Reliant's parent company, Reliant Energy,

Inc., through its subsidiaries, purchased the equity from Sithe Pennsylvania Holdings LLC and its

affiliates and subsidiaries.   Reliant Energy Mid-Atlantic is an indirect wholly owned subsidiary of

Reliant Energy Power Generation, Inc., which is a direct wholly owned subsidiary of Reliant

Resources, Inc.   Reliant Resources, Inc. is a direct wholly owned subsidiary of Reliant Energy,

Inc.   Reliant Energy Mid-Atlantic is a limited liability company organized under the laws of the

State of Delaware with its principal place of business at 1000 Main Street, Houston, Texas 77002.

Reliant Energy Mid-Atlantic owns the land, located at 5027 River Road in Upper Mount Bethel

Township, Pennsylvania, upon which the Portland Plant is located.   Reliant Energy Mid-Atlantic

purchased the land (under the name of Sithe Pennsylvania Holdings, LLC) in 1999.   According to

an SEC Form 10-K filed by Reliant Energy, Inc., Reliant Energy, Inc., in discussing the within

matter and the December 18, 2007 Complaint filed by the State of New Jersey, stated, "[w]e

believe we are indemnified by or have the right to seek indemnification from the prior owners [of

the Portland Plant] for losses and expenses that we may incur."

10.     Upon information and belief, Reliant Energy Power Generation, Inc. is a

corporation organized under the laws of the State of Delaware with its principal place of business

at 1000 Main Street, Houston, Texas 77002.

11.     Upon information and belief, Sithe owned and operated the Portland Plant from

November 1999 to May 2000.   Upon information and belief, Sithe was a limited partner in a

5

Delaware Limited Partnership formed in November 1990 by Sithe/Independence Power Partners, L.P., which is an indirect wholly owned subsidiary of Sithe.  Sithe was organized under the laws of the State of Delaware with its principal place of business located at 450 Lexington Avenue, New York, New York 10017.  Upon information and belief, as of December 31, 1999, Sithe was a privately owned entity of which 61.4% was owned by Vivendi, 29.6% was owned by Marubeni Corporation, and 9% was owned by the Sithe Employee Stock Ownership L.P.  In January 2005, Dynegy Inc. bought from Exelon Corporation all of the outstanding capital stock of the parent company of Sithe Energies, Inc.  Dynegy Inc. has an address of 1000 Louisiana, Suite 5800, Houston, Texas 77002.

13. 12.     Upon information and belief, Metropolitan Edison was the first owner and operator of the Portland Plant and owned and operated the Portland Plant until November 1999.  At all relevant times, Metropolitan Edison was a wholly owned subsidiary of GPU, Inc.  Metropolitan Edison is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 2800 Pottsville Pike, Reading, Pennsylvania 19640.  Metropolitan Edison is currently a subsidiary of First Energy Corporation.  First Energy Corporation is a corporation organized under the laws of the State of Ohio with its principal place of business at 76 South Main Street, Akron, Ohio 44308.

13.     Subsequent to the filing of the plaintiff New Jersey's initial Complaint, New Jersey entered into Stipulations and Tolling Agreements with then-named Defendants Reliant Energy, Inc., CenterPoint Energy, and GPU, Inc. whereby the parties agreed to dismiss the Complaint against these originally named Defendants without prejudice.

14.     Defendants are each a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

6

**The Harm to Connecticut**

15.     $SO_2$, $NO_x$, $NO_2$, PM emissions, and other air pollutants from the Portland Plant adversely impact the public health and the environment in Connecticut.

16.     Upon information and belief, from 2004 to 2006, the average emissions at Portland Plant Unit 1 were 11,956.5 tons per year ("tpy") of $SO_2$ and 1,122 tpy of $NO_x$.   Upon information and belief, from 2004 to 2006, the average emissions at Portland Plant Unit 2 were 18,207 tpy of $SO_2$ and 2,151 tpy of $NO_x$.   These averages total over 30,000 tpy of $SO_2$ and over 3,000 tpy of $NO_x$.   In contrast, estimated annual emissions from Units 1 and 2 with BACT installed would total less than 1,000 tpy of $SO_2$ and less than 1,000 tpy of $NO_x$.   A July 2007 report by the Environmental Integrity Project, "Dirty Kilowatts America's Most Polluting Power Plants," ranks the Portland Plant fifth in terms of highest 2006 $SO_2$ emission rate per megawatt ("MW") generated in the United States.   *See* http://www.dirtykilowatts.org/Dirty Kilowatts2007.pdf. The Environmental Integrity Project's previous May 2005 report ranked the Portland Plant eighth in terms of highest 2004 $SO_2$ emission rate per MW in the United States.

17.     Direct short-term exposures (e.g., less than three hours) to low levels of $NO_2$ may lead to changes in airway responsiveness and lung function in individuals with preexisting respiratory illnesses and increases in respiratory illnesses in children. Long-term exposures to $NO_2$ may lead to increased susceptibility to respiratory infection and may cause irreversible alterations in lung structure. In Connecticut, $NO_x$ emissions, including $NO_2$, also contribute to the formation and transport of ozone.   Ozone, a major component of smog, is created when $NO_x$ reacts with volatile organic compounds in the presence of sunlight.   Inhalation of ozone exacerbates many respiratory health problems, such as asthma, and decreases the ability of the lungs to function, sometimes permanently scarring the lung tissue.   Further, the trends of asthma rates and severity

7

are increasing.

18.    Connecticut and its citizens are harmed by $NO_x$ emissions, including $NO_2$, from the Portland Plant, which contribute to the formation of ozone in Connecticut.   Prevailing winds from the west and southwest, particularly during the summer, cause $NO_x$ emissions from the Portland Plant to travel to Connecticut.   Reliant's use of power plant stacks approximately 400 feet high at the Portland Plant increases the long-range mobility of emissions and exacerbates the impact to Connecticut's air quality.   Congress recognized the phenomenon of ozone transport in the 1990 amendments to the Act, noting that:

> The [1990 amendments] reflect[] an increasing understanding of how ozone pollution is formed and transported.   Because ozone is not a local phenomenon but is formed and transported over hundreds of miles and several days, localized control strategies will not be effective in reducing ozone levels.

Senate Report No. 101-228, reprinted in 1990 *U.S. Code Cong. and Admin. News* at 3389-99.

19.    Section 184 of the Act, 42 U.S.C. § 7511c, creates a single region for ozone, known as the Ozone Transport Region, for states that contribute to a violation of NAAQS in one or more other States.   This section mandates specific control programs in this region, as well as other measures necessary to reach attainment of ambient air quality standards.   Connecticut, New Jersey, and Pennsylvania are within the Ozone Transport Region.

20.    The Act requires each state to adopt a State Implementation Plan ("SIP") that contains emission limitations and adequate provisions prohibiting any source within a state from significantly contributing to the nonattainment of the NAAQS in any other state.   42 U.S.C. § 7410(a)(2)(A) and (D).   EPA has found that upwind states, such as Pennsylvania, significantly contribute to the inability of downwind states, such as Connecticut, to attain the ozone NAAQS. *See* 63 Fed. Reg. 57386 (Oct. 27, 1998).   EPA explains, "States adjacent to the State with the

8

nonattainment problem made the largest contribution." *Id.* In addition, EPA found specifically

that Pennsylvania, as an upwind state, contributed significantly to Connecticut's nonattainment of

the 8-hour ozone NAAQS. *Id.* at 57395.

21.    $SO_2$ can be linked to bronchial reactions, reduced lung function, premature death,

and can destabilize normal heart rhythms of Connecticut's citizens. Studies have demonstrated

that children and adults with constructive pulmonary disease, such as asthma, are at increased risk

from exposure to $SO_2$. Connecticut's citizens are impacted by $SO_2$ emissions following only

minutes of exposure, and exercising asthmatics can experience lung constriction within five to ten

minutes of exposure. *See* U.S. EPA, 1994, Supplement to the Second Addendum to the Air

Quality Criteria of Particulate Matter and Sulfur Oxides (1982).

22.    $SO_2$ also interacts in the atmosphere to form sulfate aerosols, which are also be

transported long distances through the air. Most sulfate aerosols are a subset of $PM_{2.5}$ that can

easily be inhaled. In the eastern United States, sulfate aerosols make up over 25% of the inhalable

particles, and according to recent studies, high levels of sulfate aerosols are associated with

increased sickness, respiratory distress, cardiovascular disease, and mortality from lung disorders,

such as asthma and bronchitis. Lowering sulfate aerosol emissions from electric utility plants

would significantly reduce the incidence and severity of asthma and bronchitis, as well as

associated hospital admissions and emergency room visits resulting from these ailments

23.    $NO_x$ emissions, including $NO_2$, cause eutrophication (excessive growth and decay

of aquatic plant life, resulting in decreased oxygen levels in the water) of coastal waters in

Connecticut, reducing the diversity of fish and other aquatic life in these essential waters.

Additionally, $NO_x$ emissions lead to ozone injury to vegetation.

24.    Acid deposition also has adverse effects on human health. Acid rain causes mercury

to leach from soil into waters, resulting in higher mercury levels in fish.    In addition, acidified water, ma cause lead to leach from residential pipes, causing increased consumption of lead via drinking water.

25.    Airborne particles with a nominal aerodynamic diameter of 2.5 micrometers or less are considered to be "fine particles" ($PM_{2.5}$).    Power plants, like the Portland Plant, are a major source of both direct and secondary $PM_{2.5}$.    Sulfate and nitrate formed by chemical reactions of sulfur dioxide and nitrogen oxides gases in the atmosphere after they are emitted are considered to be secondary $PM_{2.5}$ because they are converted in the atmosphere to sulfates and nitrates, as fine particles.    "Coarse particles" refers to particles that are smaller than or equal to 10 micrometers in diameter ("$PM_{10}$").    PM is the general term for all solid or liquid particles found in the air.    $PM_{2.5}$ and $PM_{10}$ are subsets of PM.      PM, $PM_{10}$, and $PM_{2.5}$ are emitted by the Portland Plant and are transported by prevailing winds to Connecticut.    Connecticut's citizens are impacted, as breathing $PM_{2.5}$ at concentrations in excess of ambient air standards increases the chances of premature death, damage to lung tissue, cancer, or respiratory disease and cardiovascular disease.    $PM_{2.5}$ and $PM_{10}$ include HAP constituents, such as lead, arsenic, cadmium, manganese, and polycyclic organic matter.    The elderly, children, and people with chronic lung disease or asthma tend to be especially sensitive to the effects of $PM_{2.5}$ and $PM_{10}$.    PM can also worsen the effects of acid rain, reduce visibility, and damage man-made materials.

## STATUTORY AND REGULATORY BACKGROUND

26.    The Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air in order to promote the public health and welfare and the productive capacity of the population.    42 U.S.C. § 7401(b)(1).

10

## THE NATIONAL AMBIENT AIR QUALITY STANDARDS

27.   Section 108(a) of the Act, 42 U.S.C. § 7408(a), requires the EPA Administrator to identify and prepare air quality criteria for each air pollutant, emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse sources.   For each such "criteria" pollutant, Section 109 of the Act, 42 U.S.C. § 7409, requires the EPA to promulgate regulations establishing primary and secondary NAAQS.   The primary NAAQS must be adequate to protect the public health, and the secondary NAAQS must be adequate to protect the public welfare, from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.   Pursuant to Sections 108 and 109 of the Act, EPA has identified and promulgated NAAQS for various pollutants, including $SO_2$, $NO_2$, ozone, and PM (measured in the ambient air as $PM_{2.5}$ and $PM_{10}$).   40 C.F.R. §§ 50.4-50.11.

28.   Under the Act, each state is required to submit to EPA for designation those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.   42 U.S.C. § 7407(d).   An area that meets the NAAQS for a particular criteria pollutant or where there is insufficient data to make such a determination is termed an "attainment" area; an area that does not meet the NAAQS, or that contributes to ambient air quality in a nearby area that does not meet the NAAQS, is termed a "nonattainment" area.   42 U.S.C. § 7407(d)(1)(A)(i)-(iii).   In redesignating an area, the Administrator may base the decision on air quality data, planning and control considerations, or any other air quality-related considerations that the Administrator deems appropriate.   42 U.S.C. § 7407(d)(1)(C)(3).

29.   To achieve its purposes, the Act creates a federal-state partnership in which each state must adopt a SIP that provides for the attainment and maintenance of the NAAQS.   42

11

U.S.C. § 7410.  The states are then required to submit the SIP to EPA for approval.  Id.  Each

SIP must, e.g., contain emission limitations and adequate provisions prohibiting any source within

a state from significantly contributing to the nonattainment of NAAQS of any other state.  42

U.S.C. § 7410(a)(2)(A) and (D).

30.  In 1987, EPA changed the indicator for PM from total suspended particulate (TSP),

for which the EPA first established NAAQS in 1971, to $PM_{10}$.  52 Fed. Reg. 24634 (July 1, 1987).

The EPA established NAAQS for $PM_{2.5}$ in 1997.  62 Fed. Reg. 38652 (July 18, 1997).  At this

time, the EPA retained the 24-hour NAAQS for $PM_{10}$, which were originally promulgated in 1987,

see 52 Fed. Reg. 24672 (July 1, 1987).  The EPA revised the $PM_{2.5}$ and $PM_{10}$ NAAQS on October

17, 2006.  71 Fed. Reg. 6144.  Specifically, EPA tightened the 24-hour $PM_{2.5}$ NAAQS, to 35

micrograms per cubic meter.  Id.  On December 17, 2004, EPA established initial air quality

designations and classifications for $PM_{2.5}$ NAAQS.  See 70 Fed. Reg. 944.  The EPA must

establish air quality designations for the more stringent 24-hour $PM_{2.5}$ NAAQS at the end of 2008.

See www.epa.gov/oar/particlepollution/naaqsrev2006.html#timeline.

31.  The EPA promulgated the primary 24-hour NAAQS and secondary 3-hour NAAQS

for $SO_2$ in 1971, and have not changed them since.  36 Fed. Reg. 8186 (Apr. 28, 1971).  The

NAAQS for $NO_2$ were also set at this time.  Id.

32.  Pennsylvania is currently designated attainment for $SO_2$, unclassifiable for $NO_2$, and

unclassifiable/attainment for $PM_{2.5}$ and $PM_{10}$.  40 C.F.R. § 81.339.  The Pennsylvania

Department of Environmental Protection ("PADEP") has recommended to EPA that Northampton

County, where the Portland Plant is located, be designated nonattainment for the revised 24-hour

$PM_{2.5}$ NAAQS.  See www.depweb.state.pa.us.

12

## PREVENTION OF SIGNIFICANT DETERIORATION

33.   Part C of subchapter I of the Act, 42 U.S.C. §§ 7470-7479, sets forth requirements for

the prevention of significant deterioration of air quality in areas designated attainment, or areas

designated unclassifiable.   These requirements are designed to protect public health and welfare,

to assure that economic growth will occur in a manner consistent with the preservation of existing

clean air resources, to assure that emissions from one State will not interfere with another State's

plan for the prevention of significant deterioration, and to effectuate these goals, assure that any

decision to permit increased air pollution is made only after careful evaluation of all the

consequences of such a decision, including the interstate effects, and after public participation in

the decision-making process.   42 U.S.C. § 7470(1), (3), (4) and (5).   These provisions are

referred to herein as the "PSD program."

34.   The Act further mandates that the construction or "modification" of a "major emitting

facility" in an area designated in attainment cannot occur unless a PSD permit has been issued.   42

U.S.C. §§ 7475(a) and 7479.   In addition, no construction or modification of such a facility can

occur until the owner or operator demonstrates "that emissions from construction or operation of

such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable

increase or maximum allowable concentration for any pollutant in any area to which this part

applies more than one time per year, (B) national ambient air quality standard in any air quality

control region, or (c) any other applicable emission standard or standard of performance under this

chapter."   42 U.S.C. § 7475(a)(3).   In addition, no construction or modification of a major

emitting facility may occur until the proposed facility is subject to BACT for each pollutant

emitted by the facility and subject to regulation under the Act.   42 U.S.C. § 7475(a)(4).   The

obligation to comply with BACT at the facility for each regulated pollutant is an ongoing,

13

operational requirement.  *See, e.g.*, 42 U.S.C. §§ 7475(a)(4)(a)(4) and (a)(7).

35.    "Major emitting facility" is defined to include, *inter alia*, any fossil-fuel fired steam electric plant with a heat input of more than 250 million British thermal units per hour (250 mmBtu/hr) that emits or has the potential to emit 100 tpy or more of any air pollutant.  42 U.S.C. § 7479(1).  "Modification" is defined as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  42 U.S.C. § 7411(a)(4); *see also* 42 U.S.C. § 7479(2)(c).  The Act defines "owner or operator" as "any person who owns, leases, operates, or controls or supervises a stationary source."  42 U.S.C. § 7411(a)(5).

36.  Section 161 of the Act, 42 U.S.C. § 7471, requires that each SIP contain emission limitations and such other measures as may be necessary, as determined under the regulations promulgated pursuant to these provisions, to prevent significant deterioration of air quality in attainment areas.

37.  A state may comply with Sections 110(a) and 161 of the Act by being delegated by EPA the authority to implement the federal PSD regulations set forth at 40 C.F.R. § 52.21, or by having its own PSD regulations approved by EPA as part of its SIP, which cannot be less stringent than those set forth at 40 C.F.R. § 51.166, <u>see</u> 42 U.S.C. § 7416.

38.  To implement the PSD program, EPA promulgated regulations in 1980, 45 Fed. Reg. 52676 (Aug. 7, 1980) at 40 C.F.R. § 52.21.  EPA revised, in part, the PSD regulations in 1992. 57 Fed. Reg. 32314 (July 21, 1992).  Although EPA finalized revisions to the PSD regulations on December 31, 2002, *see* 67 Fed. Reg. 80186, and December 21, 2007, *see* 72 Fed. Reg. 72607, these PSD rule revisions do not apply retroactively.  *See, e.g., Bowen v. Georgetown Univ. Hosp.,*

488 U.S. 204, 208 (1988).   EPA has also proposed further revisions to the PSD program, *see, e.g.,* 70 Fed. Reg. 61081 (Oct. 20, 2005), 71 Fed. Reg. 54235 (Sept. 14, 2006), and 72 Fed. Reg. 26202 (May 8, 2007), but has not finalized them.   The PSD program revisions at 68 Fed. Reg. 61248 (Oct. 27, 2003) were vacated by the Circuit Court of Appeals for the D.C. Circuit on March 17, 2006.   *See New York v. EPA*, 443 F.3d 880 (D.C. Cir. 2006).   Therefore, the 1980 regulations apply to the "modifications" alleged in this First Amended Complaint to have occurred at the Portland Plant before July 21, 1992, and the 1992 regulations apply to the "modifications" that occurred after July 21, 1992.   In general, the regulations referred to herein refer to the 1980 regulations.

39.   The regulations also prohibit the construction or "major modification" of a major stationary source in any attainment area unless a PSD permit has been issued that satisfies the requirements of the regulations.   40 C.F.R. §§ 52.21(i), 52.21(j)-(r).   Mirroring the Act, the regulations define the term "major stationary source" to include, *inter alia*, any fossil-fuel-fired steam electric plant of more than 250 million Btu/hr that emits or has the potential to emit 100 tpy or more of any air pollutant subject to regulation under the Act.   40 C.F.R. § 52.21(b)(1)(i).

40. "Major modification" is defined at 40 C.F.R. § 52.21(b)(2)(i) as any physical change or change in the method of operation of a major stationary source that would result in a "significant" net emissions increase of any pollutant subject to regulation under the Act.   "Significant" is defined at 40 C.F.R. § 52.21(b)(23)(i) "in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates": 40 tpy for $NO_2$ and $SO_2$; 25 tpy for PM (previous indicator TSP); 15 tpy for $PM_{10}$; and 10 tpy for $PM_{2.5}$ (as of May 16, 2008).

41.   "Net emissions increase" means "the amount by which the sum of the following

15

exceeds zero: (a) any increase in actual emissions (as defined by 40 C.F.R. § 52.21(b)(21)) from a particular physical change or change in method of operation at a stationary source; and (b) any other increases and decreases in actual emissions (as defined by 40 C.F.R. § 52.21(b)(21) to mean "the actual rate of emissions of a pollutant from an emissions unit") at the source that are contemporaneous with the particular change and are otherwise creditable."   40 C.F.R. § 52.21(b)(3)(I).

42.   As set forth at 40 C.F.R. § 52.21(j), *see also* 42 U.S.C. § 7475(a)(4), a source undertaking a major modification in an attainment area must install and operate BACT for each pollutant subject to regulation under the Act for which the modification would result in a significant net emissions increase.   BACT is the maximum degree of emission reduction achievable for each pollutant regulated under the Act, taking into consideration energy, environmental, and economic impacts of the emission reductions.   40 C.F.R. § 52.21(b)(12); *see also* 42 U.S.C. § 7479(3).

43.   To ensure that the major modification does not result in a violation of the NAAQS, the regulations require that the facility perform air quality modeling and analysis of resulting emissions.   As set forth in 40 C.F.R. §§ 52.21(k) and 52.21 (l), the PSD program requires a person who wishes to modify a major source in an attainment area to demonstrate, before construction commences, that the modification will not cause or contribute to a violation of any NAAQS in any air quality region or any allowable pollution increment in any area.

## PENNSYLVANIA PSD/SIP REGULATIONS

44.   The requirements of the federal PSD regulations at 40 C.F.R. § 52.21 have been incorporated by reference into the federally enforceable SIP for Pennsylvania (40 C.F.R. §§ 52.2020-.2063), as set forth at 40 C.F.R. § 52.2058.   On August 21, 1984, EPA accepted

16

amendments to Pennsylvania's Chapter 127 regulations, thereby enabling, "[PADEP] to administer the PSD requirements contained in 40 C.F.R. Part 52.21.   The addition of § 127.83 adopts 40 C.F.R. § 52.21 by reference in its entirety."   *See* 49 Fed. Reg. 33127 (Aug. 21, 1984); 40 C.F.R. § 52.2023.   The federal PSD regulations require a person who intends to construct or undertake a "major modification" at a major emitting facility in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any NAAQS or any specified PSD increment amount.   40 C.F.R. § 52.21(k).   These regulations also prohibit the construction or "major modification" of a major stationary source in any attainment area unless a PSD permit has been issued that satisfies the requirements of the regulations.   40 C.F.R. §§ 52.21(i), 52.21(j)-(r).   Pennsylvania has adopted in its entirety the federal PSD regulations at 40 C.F.R. § 52.21, *see* 25 Pa. Code § 127.83, and consequently, the federal PSD permit, air pollution controls, and ambient air quality requirements.

45.   Before the EPA approved the Pennsylvania PSD regulations, the federal PSD regulations, codified at 40 C.F.R. § 52.21 *et seq.*, applied to facilities located in Pennsylvania. *See, e.g.*, 49 Fed. Reg. 33127 (Aug. 21, 1984).

## TITLE V PROGRAM UNDER THE CLEAN AIR ACT AND PENNSYLVANIA LAW

46.   Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources" and "major stationary sources."   "Major source" is defined, *see* 42 U.S.C. § 7661(2), to include "a major stationary source" as defined pursuant to 42 U.S.C. § 7602(z).   *See also* 40 C.F.R. §§ 70.2 & 70.3.   Title V requires sources subject to PSD to obtain Title V operating permits.   42 U.S.C. § 7661a(a).

47.   EPA approved Pennsylvania's Title V operating permit program effective August 29, 1996.   61 Fed. Reg. 39597 (July 30, 1996).   Pennsylvania's Title V operating permit program

17

is codified at 25 Pa. Code §§ 127.401-.464 & 127.501 *et seq.*   Pursuant to Pennsylvania regulations, "major stationary sources" are required to obtain a Title V operating permit.   25 Pa. Code § 121.1.

48.    Pursuant to 42 U.S.C. § 7661b(c), any person "required to have a permit," must submit a compliance plan and an application for a permit "signed by a responsible official, who shall certify the accuracy of the information submitted." *See also* 40 C.F.R. § 70.6(c)(3).   Each permit issued under Title V is to include enforceable emission limitations and standards and a schedule for compliance to ensure compliance with all "applicable requirements" of the Act.   42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a)(1); 25 Pa. Code § 127.512(h).

49.    Pursuant to 40 C.F.R. § 70.2, "applicable requirements" are defined to include, *inter alia*, any standard set forth in a SIP, any term or condition of a PSD permit, and "requirements that have been promulgated or approved by EPA," including the requirement that a source at which a "major modification," as defined in 40 C.F.R. § 52.21(b)(2)(i), was undertaken, comply with an emission rate that meets BACT.  *See also* 25 Pa. Code §§ 121.1, 127.502(a).

50.    Among other things, the following information is required in an application for the issuance or renewal of a Title V operating permit: (1) a citation and description of all applicable air pollution control requirements; (2) other specific information that may be necessary to implement and enforce other applicable requirements of the CAA, 40 C.F.R. Part 70 (regarding approved state operating permit programs), or to determine the applicability of such requirements; and (3) a compliance plan including (i) a description of the compliance status of each stationary source with respect to applicable requirements, (ii) a narrative description of how the facility will achieve compliance with applicable requirements, if any, for which it is not in compliance, and (iii) a schedule of remedial measures leading to compliance with applicable requirements for which the

18

facility is not in compliance.   40 C.F.R. § 70.5(c)(4), (5) & (8); *see also* 25 Pa. Code §§ 127.513(3); 127.503(4), (5) and (8).

51.    A Title V permit application, including an application for renewal, must also include a certification of compliance with applicable requirements and a certification as to truth, accuracy and completeness, by a responsible official of the entity seeking the permit.   40 C.F.R. § 70.5(c)(9) & (d); 25 Pa. Code §§ 127.503(10) & 127.402(d).   In addition, a Title V permit application shall "[s]how that the source will not prevent or adversely affect the attainment or maintenance of ambient air quality standards when requested by the Department."   25 Pa. Code § 127.12(6).

52.    An applicant for a Title V permit, or its renewal, who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of the failure or incorrect submittal, promptly submit such supplementary facts or corrected information.   40 C.F.R. § 70.5(b); *see also* 25 Pa. Code § 127.414(a), (b) & (c).   In addition, an applicant must "provide additional information as necessary to address any requirements that become applicable to the source after the date it filed a complete application, but prior to the release of a draft permit."   *Id.*

53.    Section 504(a) of the Act, 42 U.S.C. § 7661c(a), the implementing regulations of the Act, 40 C.F.R. § 70.2, and the Pennsylvania Title V operating permit program regulation, 25 Pa. Code § 127.512, require that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with applicable requirements of the Act and the requirements of the applicable SIP, including any applicable PSD requirement to comply with an emission rate that meets BACT.

54.    Section 502(a) of the Act, 42 U.S.C. § 7661a(a), and 25 Pa. Code § 127.512, have at

19

all times relevant to this action made it unlawful for any person to violate any requirement of a

permit issued under Title V or to operate a "major source" except in compliance with a permit

issued by a permitting authority under Title V.    Further, it is unlawful to operate a source in

violation of Title V operating permit requirements.    25 Pa. Code §§ 127.512(c)(1); 127.402(a) &

(c) and 127.443.

  55. The Pennsylvania SIP, which applied to the Portland Plant before the issuance of a

Title V permit for the Portland Plant, prohibits any person from operating any modified stationary

air contamination source unless PADEP issued such person a valid plan approval.    25 Pa. Code §

127.11.  An application for such approval must, among other requirements, demonstrate that the

source will comply with the Act, that emissions will be controlled through the use of best available

technology, and that the source will not prevent or adversely affect the attainment or maintenance

of ambient air quality standards.  *Id.* at § 127.12.  Each plan approval shall incorporate by

reference requirements of the Pennsylvania Air Pollution Control Act and of the Clean Air Act.

*Id.* at § 127.12b(b).

## CLEAN AIR ACT ENFORCEMENT PROVISIONS

  56. Pursuant to 42 U.S.C. § 7604(a)(1), any person may commence in the United States

District Courts a suit against any person "alleged to have violated (if there is evidence that the

alleged violation is repeated) or to be in violation of . . . an emission standard or limitation under

the Act."    The term "emission standard or limitation" includes: (1) an emission limitation or

standard; (2) any condition or requirement of a PSD permit; (3) any term or condition of a Title V

permit; and (4) "any requirement to obtain a permit as a condition of operations."   42 U.S.C. §

7604 (f)(1), (3), & (4).   Under 42 U.S.C. § 7604(a)(3), any person may file suit in federal district

court against any person who undertakes a major modification of a major emitting facility without

first obtaining a permit that is required pursuant to the PSD provisions of the Act. No notice must be provided before the commencement of a suit pursuant to 42 U.S.C. § 7604(a)(3); *see* 42 U.S.C. § 7604(b).

57. 42 U.S.C. § 7602(e) defines "person" to include, *inter alia*, an individual, a corporation, a State or a political subdivision of a State. Connecticut and each of the Defendants are "persons" within the meaning of 42 U.S.C. § 7602(e).

58. 42 U.S.C. § 7604(a) authorizes both injunctive relief and civil penalties.

### FACTS COMMON TO ALL CAUSES OF ACTION

59. Reliant owns and operates, and at all relevant times under this First Amended Complaint, the Defendants owned and operated, the Portland Plant located in Upper Mt. Bethel Township, Northampton County, Pennsylvania.

60. The Portland Plant includes five electricity generating units. Units 1 and 2 each consist of one coal-fired boiler and one steam turbine, and Units 3, 4 and 5 each consist of a combustion turbine that burns natural gas or oil. Unit 1 was placed into service in 1958 and has a reported electrical generating capacity of 158 MW. Unit 2 was placed into service in 1962 and has a reported electrical generating capacity of 242 MW. Unit 3 was placed into service in 1967 and has a reported electrical generating capacity of 15 MW. Unit 4 was placed into service in 1971 and has a reported electrical generating capacity of 22 MW. Unit 5 was placed into service in 1994 and has a reported electrical generating capacity of 150 MW.

61. When the Defendants constructed the Portland Plant, and on August 7, 1980, when the federal PSD regulations became effective, the Portland Plant had the potential to emit, and continues to have the potential to emit, in excess of 100 tpy each of $NO_2$, $SO_2$ and PM.

62. The Portland Plant is, and was at the time of the modifications identified in this

21

First Amended Complaint, a "major emitting facility" within the meaning of 42 U.S.C. § 7479(1) and a "major stationary source" for $SO_2$, $NO_2$ (which is a part of $NO_x$) and PM within the meaning of 40 C.F.R. § 52.21(b)(1)(i)(b).  *See also* 42 U.S.C. § 7602(z).

63.    On July 28, 1995, Metropolitan Edison submitted an initial Title V operating permit application to PADEP.   In or around January, 2000, PADEP issued a Title V Operating Permit for the operation of the Portland Plant (the "Operating Permit").   PADEP issued the Operating Permit pursuant to the Pennsylvania Air Pollution Control Act, 35 P.S. § 4001 et seq., and 25 Pa. Code § 127.   On May 29, 2003, PADEP issued a minor modification to the Title V permit to Defendants for the operation of the Portland Plant (the "Title V Permit").

### FIRST CLAIM FOR RELIEF

### (Unit 1- First Physical Changes–PSD Violations)

64.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

65.    At various times since the effective date of the PSD regulations, Metropolitan Edison and Reliant constructed modifications and major modifications, as defined herein, on Unit 1.

66.    Between 1983 and 1988, Metropolitan Edison replaced, *inter alia*, approximately 1,000 waterwall and waterwall slope tubes at Unit 1 at a cost of over $8,000,000.   These major construction projects (the "First Unit 1 Physical Changes") were conducted during annual planned outages occurring:

> October 3, 1983 to December 2, 1983;
> February 18, 1985 to April 27, 1985;
> March 31, 1986 to June 25, 1986;
> April 6, 1987 to May 8, 1987; and
> September 19, 1988 to December 24, 1988.

22

67.    Based upon information obtained as of the filing of this First Amended Complaint, the First Unit 1 Physical Changes, individually and/or collectively, resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_2$ and a net increase of more than 25 tpy of PM.

68.    The First Unit 1 Physical Changes, individually and/or collectively, were modifications pursuant to 42 U.S.C. § 7411(a)(4) and were major modifications within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code § 127.83.   Thus, Metropolitan Edison was required to obtain a PSD permit before constructing these modifications and to otherwise comply with the PSD requirements, and all Defendants were required to comply with PSD requirements due to these modifications and have a continuing obligation to comply with PSD requirements.

69.    Metropolitan Edison did not apply for or obtain a PSD permit and none of the Defendants has applied for or obtained a PSD permit for the First Unit 1 Physical Changes in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21.

70.    Before constructing the First Unit 1 Physical Changes, Metropolitan Edison failed to demonstrate that the resulting emissions increases would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through (r), and no Defendant has made the required demonstration.

71.    The Defendants have operated and continue to operate the Portland Plant without PSD permits and without implementing BACT for the reduction of $SO_2$, $NO_2$, and PM emissions from Unit 1 as required by 42 U.S.C. § 7475(a)(4).

72.    Since constructing the First Unit 1 Physical Changes, the Defendants have been in

23

violation of the Act's PSD requirements, 42 U.S.C. §§ 7470-7479, the implementing federal regulations at 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

73.    Upon information and belief, subject to further investigation and discovery, the Defendants may have made other modifications, as defined by the PSD regulations, to Unit 1.

74.    These violations of the Act, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### SECOND CLAIM FOR RELIEF

### (Unit 1- Second Physical Changes–PSD Violations)

75.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

76.    Metropolitan Edison again modified Unit 1 in 1986 by replacing the entire high temperature superheater outlet header at a cost of $1,129,700 and replacing 54 tubes in the radiant economizer (the "Second Unit 1 Physical Changes").   These modifications occurred during the planned outage in the Spring of 1986.

77.    Based upon information obtained as of the filing of this First Amended Complaint and belief, the Second Unit 1 Physical Changes individually and/or collectively resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_2$.

78.    The Second Unit 1 Physical Changes individually and/or collectively were modifications within the meaning of 42 U.S.C. § 7411(a)(4) and were major modifications within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code § 127.83.   Thus, Metropolitan Edison was required to obtain a PSD permit before constructing the modifications and otherwise comply with the PSD requirements and all Defendants were required to comply with PSD due to these modifications and have a continuing obligation to comply with PSD requirements.

79.     Metropolitan Edison did not apply for or obtain a PSD permit and no Defendant has applied for or obtained a PSD permit for the Second Unit 1 Physical Changes in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21.

80.     Before constructing the Second Unit 1 Physical Changes, Metropolitan Edison failed to demonstrate that the resulting emissions increases would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through ( r) and no Defendant has made the required demonstration.

81.     The Defendants have operated and continue to operate the Plant without PSD permits and without the implementation of BACT for reducing $SO_2$ and $NO_2$ emissions from Unit 1 as required by 42 U.S.C. § 7475(a)(4).

82.     Since constructing the Second Unit 1 Physical Changes, the Defendants have been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470 - 7479, the implementing federal regulations, 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

83.     Upon information and belief, subject to further investigation and discovery, the Defendants may have made other modifications as defined by the PSD regulations to Unit 1.

84.     These violations of the Act, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### THIRD CLAIM FOR RELIEF

### (Unit 1–Third Physical Change–PSD Violations)

85.     Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

25

86.     Metropolitan Edison again modified Unit 1 in 1982 by replacing 35 outlet header nipples (the "Third Unit 1 Physical Change"). This modification occurred during the planned outage in the Fall of 1982.

87.     Based upon information obtained as of the filing of this First Amended Complaint and belief, the Third Unit 1 Physical Change resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_2$.

88.     The Third Unit 1 Physical Change was a modification within the meaning of 42 U.S.C. § 7411(a)(4) and was major modification within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code § 127.83. Thus, Metropolitan Edison was required to obtain a PSD permit before constructing the modification and otherwise comply with the PSD requirements and all Defendants were required to comply with PSD due to this modification and have a continuing obligation to comply with PSD requirements.

89.     Metropolitan Edison did not apply for or obtain a PSD permit and no Defendant has applied for or obtained a PSD permit for the Third Unit 1 Physical Change in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21.

90.     Before constructing the Third Unit 1 Physical Change, Metropolitan Edison failed to demonstrate that the resulting emissions increases would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through (r) and no Defendant has made the required demonstration.

91.     The Defendants have operated and continue to operate the Portland Plant without PSD permits and without the implementation of BACT for reducing $SO_2$ and $NO_2$ emissions from

Unit 1 as required by 42 U.S.C. § 7475(a)(4).

92.    Since constructing the Third Unit 1 Physical Change, the Defendants have been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470 - 7479, the implementing federal regulations, 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

93.    Upon information and belief, subject to further investigation and discovery, the Defendants may have made other modifications as defined by the PSD regulations to Unit 1.

94.    These violations of the CAA, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

## FOURTH CLAIM FOR RELIEF

### (Unit 1 –Fourth Physical Change–PSD Violations)

95.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

96.    Metropolitan Edison again modified Unit 1 in 1992 by replacing additional boiler waterwall tubes at a cost of $1,756,263 ("Fourth Unit 1 Physical Change").

97.    Based upon information obtained as of the filing of this First Amended Complaint and belief, the Fourth Unit 1 Physical Change resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_2$.

98.    The Fourth Unit 1 Physical Change was a modification within the meaning of 42 U.S.C. § 7411(a)(4) and was a major modification within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code § 127.83. *See also* 40 C.F.R. § 52.21 (1992).   Thus, Metropolitan Edison was required to obtain a PSD permit before constructing the modification and otherwise comply with the PSD requirements and all Defendants were required to comply with PSD due to this modification and have a continuing obligation to comply with PSD requirements.

27

99.    Metropolitan Edison did not apply for or obtain a PSD permit and no Defendant has applied for or obtained a PSD permit for the Fourth Unit 1 Physical Change in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21. *See also* 40 C.F.R. § 52.21 (1992).

100.    Before constructing the Fourth Unit 1 Physical Change, Metropolitan Edison failed to demonstrate that the resulting emissions increases would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through (r) and no Defendant has made the required demonstration. *See also* 40 C.F.R. § 52.21 (1992).

101.    The Defendants have operated and continue to operate the Portland Plant without PSD permits and without the implementation of BACT for reducing $SO_2$ and $NO_2$ emissions from Unit 1 as required by 42 U.S.C. § 7475(a)(4).

102.    Since constructing the Fourth Unit 1 Physical Change, the Defendants have been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470 7479, the implementing federal regulations, 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

103.    Upon information and belief, subject to further investigation and discovery, the Defendants may have made other modifications as defined by the PSD regulations to Unit 1.

104.    These violations of the CAA, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### FIFTH CLAIM FOR RELIEF

### (Unit 1 –Fifth Physical Change–PSD Violations)

105.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

28

106.    Reliant modified Unit 1 in 2001 by replacing Superheater Dissimilar Metal Tube Weld Replacements (the "Fifth Unit 1 Physical Change").

107.    Based upon information obtained as of the filing of this First Amended Complaint and belief, the Fifth Unit 1 Physical Change resulted in a net emissions increase of more than 40 tpy of $SO_2$.

108.    The Fifth Unit 1 Physical Change was a modification within the meaning of 42 U.S.C. § 7411(a)(4) and was a major modification within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code § 127.83. *See also* 40 C.F.R. § 52.21 (1992). Thus, Reliant was required to obtain a PSD permit before constructing the modification and otherwise comply with the PSD requirements and has a continuing obligation to comply with the PSD requirements.

109.    Reliant did not apply for or obtain a PSD permit for the Fifth Unit 1 Physical Change in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21. *See also* 40 C.F.R. § 52.21 (1992).

110.    Before constructing the Fifth Unit 1 Physical Change, Reliant failed to demonstrate that the resulting emissions increases would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through (r). *See also* 40 C.F.R. § 52.21 (1992).

111.    Reliant operated and continues to operate the Portland Plant without PSD permits and without the implementation of BACT for reducing $SO_2$ emissions from Unit 1 as required by 42 U.S.C. § 7475(a)(4)).

112.    Since constructing the Fifth Unit 1 Physical Change, Reliant has been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470 7479, the implementing federal regulations, 40

29

C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

113.    Upon information and belief, subject to further investigation and discovery, the Defendants may have made other modifications as defined by the PSD regulations to Unit 1.

114.    These violations of the CAA, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

## SIXTH CLAIM FOR RELIEF

### (Unit 1 –Sixth Physical Change–PSD Violations)

115.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

116.    Reliant again modified Unit 1 in 2005 by replacing waterwall tubes ("Sixth Unit 1 Physical Change").

117.    Based upon information obtained as of the filing of this First Amended Complaint and belief, this project resulted in a net emissions increase of more than 40 tpy of $SO_2$.

118.    The Sixth Unit 1 Physical Change was a modification within the meaning of 42 U.S.C. § 7411(a)(4) and was a major modification within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code § 127.83.    *See also* 40 C.F.R. § 52.21 (1992).    Thus, Reliant was required to obtain a PSD permit before constructing the modification and otherwise comply with the PSD requirements and has a continuing obligation to comply with the PSD requirements.

119.    Reliant did not apply for or obtain a PSD permit for the Sixth Unit 1 Physical Change in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21.    *See also* 40 C.F.R. § 52.21 (1992).

120.    Before constructing the Sixth Unit 1 Physical Change, Reliant failed to demonstrate that the resulting emissions increases would not cause or contribute to air pollution in

excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through (r).  *See also* 40 C.F.R. § 52.21 (1992).

121.    Reliant operated and continues to operate the Portland Plant without PSD permits and without the implementation of BACT for reducing $SO_2$ emissions from Unit 1 as required by 42 U.S.C. § 7475(a)(4).

122.    Since constructing the Sixth Unit 1 Physical Change, Reliant has been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470 7479, the implementing federal regulations, 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

123.    Upon information and belief, subject to further investigation and discovery, the Defendants may have made other modifications as defined by the PSD regulations to Unit 1.

124.    These violations of the CAA, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### SEVENTH CLAIM FOR RELIEF

### (Unit 2–First Physical Changes–PSD Violations)

125.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

126.    At various times since the effective date of the PSD regulations, Metropolitan Edison, Reliant and/or Sithe constructed modifications and major modifications, as defined herein, on Unit 2.

127.    Between 1980 and 1989, Metropolitan Edison modified Unit 2 by replacing the major portions of the waterwall and the waterwall slope tubes at a cost in excess of $8,500,000.

Major construction projects (the "First Unit 2 Physical Changes") were conducted during annual planned outages at the Plant, including:

> Boiler Tube Replacement, 1980;
> Waterwall Tube Replacement, 1982;
> "Boiler" work, 1983;
> Slope Tubes and Wall Tubes Replacement, 1985;
> Boiler Tube Replacement, 1987;
> Boiler Tube Replacement, 1989;
> Slope Tube Replacement, 1980;
> Slope Tube Replacement, 1982; and
> Slope Tube Replacement, 1989.

128.    The First Unit 2 Physical Changes individually and/or collectively resulted in a net emissions increase of more than 40 tpy for both $NO_2$ and $SO_2$ and more than 25 tpy of PM.

129.    The First Unit 2 Physical Changes individually and/or collectively were modifications within the meaning of 42 U.S.C. § 7411(a)(4) and were major modifications within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code § 127.83.   Thus, Metropolitan Edison was required to obtain a PSD permit before constructing the modifications and otherwise comply with the PSD requirements and all Defendants were required to comply with PSD due to these modifications and have a continuing obligation to comply with PSD requirements.

130.    Metropolitan Edison not apply for or obtain a PSD permit and no Defendant has applied for or obtained a PSD permit for the First Unit 2 Physical Changes in violation of 42 U.S.C. 7475 and 40 C.F.R. § 52.21.

131.    Before constructing the First Unit 2 Physical Changes, Metropolitan Edison failed to demonstrate that the resulting emissions increases would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 (preconstruction requirements) or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j)

through (r) and no Defendant has made the required demonstration.

132.    Defendants have operated and continue to operate the Portland Plant without PSD permits and without the implementation of BACT for reducing $SO_2$, $NO_2$ and PM emissions from Unit 2 as required by 42 U.S.C. § 7475(a)(4).

133.    Since constructing the First Unit 2 Physical Changes, the Defendants have been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470-7479, the implementing federal regulations, 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

134.    Upon information and belief, subject to further investigation and discovery, the Defendants may have made other modifications as defined by the PSD regulations to Unit 2.

135.    These violations of the CAA, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

## EIGHTH CLAIM FOR RELIEF

### (Unit 2 - Second Physical Changes–PSD Violations)

136.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

137.    Metropolitan Edison again modified Unit 2 between 1980 and 1989, by replacing substantial portions of the reheater section of the boiler during three planned outages ("Second Unit 2 Physical Changes").    For example, in 1982, one half of the front section of the reheater was replaced with stainless steel tubes.    These major construction projects were conducted during annual planned outages including:

> Reheater Tube Replacement, 1980;
> Reheater Replacement, 1982; and
> Reheater Loop Replacement, 1989.

138.    Based upon information obtained as of the filing of this First Amended Complaint

and belief, these projects individually and/or collectively resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_2$.

139.    Each of the projects individually and/or collectively was a major modification within the meaning of 40 C.F.R. § 52.21(b)(2) and/or 25 Pa. Code § 127.83.   Thus, Metropolitan Edison was required to obtain a PSD permit prior to constructing the modification and otherwise comply with the PSD requirements and all Defendants were required to comply with PSD due to these modifications and have a continuing obligation to comply with PSD requirements.

140.    Metropolitan Edison did not apply for or obtain and no Defendant has applied for or obtained a PSD permit for the Second Unit 2 Physical Changes in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21.

141.    Before constructing the Second Unit 2 Physical Changes, Metropolitan Edison failed to demonstrate that the emissions increases resulting from the modification would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 (preconstruction requirements) or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through ( r) and no Defendant has made the required demonstration.

142.    The Defendants have operated and continue to operate the Plant without PSD permits and without the implementation of BACT for reducing $SO_2$  and $NO_2$ emissions from Unit 2 as required by 42 U.S.C. § 7475(a)(4).

143.    Since constructing the Second Unit 2 Physical Changes, Defendants have been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470 - 7479, the implementing federal regulations, 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

144.    Upon information and belief, subject to further investigation and discovery,

34

Defendants may have made other major modifications as defined by the PSD regulations to Unit 2.

145.    These violations of the Act, the implementing regulations and the Pennsylvania regulations will continue unless restrained by an order of this Court.

## NINTH CLAIM FOR RELIEF

### (Unit 2 - Third Physical Changes–PSD Violations)

146.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

147.    Metropolitan Edison again modified Unit 2 in 1995 by replacing the entire platen and pendant superheater headers as well as the associated pendant superheater tubes at a cost of $2,378,919 (the "Third Unit 2 Physical Changes").

148.    Based upon information obtained as of the filing of this First Amended Complaint and belief, these projects individually and/or collectively resulted in a net emissions increase of more than 40 tpy for both $SO_2$ and $NO_2$.

149.    These projects individually and/or collectively were modifications within the meaning of 42 U.S.C. § 7411(a) and were major modifications within the meaning of 40 C.F.R. § 52.21(b)(2) and/or 25 Pa. Code § 127.83.   Thus, Metropolitan Edison was required to obtain a PSD permit prior to constructing the modifications and otherwise comply with the PSD requirements and all Defendants were required to comply with PSD due to these modifications and have a continuing obligation to comply with PSD requirements.

150.    Metropolitan Edison did not apply for or obtain a PSD permit and no Defendant applied for or obtained a PSD permit for the Third Unit 2 Physical Changes in violation of 42 U.S.C. 7475 and 40 C.F.R. § 52.21.

151.    Before constructing the Third Unit 2 Physical Changes, Metropolitan Edison failed

to demonstrate that the emissions increases resulting from the modifications would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 (preconstruction requirements) or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through ( r) and no Defendant has made the required demonstration.

152.    Defendants have operated and continue to operate the Plant without PSD permits and without the implementation of BACT for reducing $SO_2$ and $NO_2$ emissions from Unit 2 as required by 42 U.S.C. § 7475(a)(4).

153.    Since constructing the Third Unit 2 Physical Changes, the Defendants have been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470 7479, the implementing federal regulations, 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

154.    Upon information and belief, subject to further investigation and discovery, Defendants may have made other major modifications as defined by the PSD regulations to Unit 2.

155.    These violations of the Act, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

### TENTH CLAIM FOR RELIEF

### (Unit 2 –Fourth Physical Change–PSD Violations)

156.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

157.    Reliant and/or Sithe modified Unit 2 after 2000 by replacing waterwall arch tubes ("Fourth Unit 2 Physical Change").

158.    Based upon information obtained as of the filing of this First Amended Complaint and belief, this project resulted in a net emissions increase of more than 40 tpy of $SO_2$ and $NO_2$.

159.    This project was a modification within the meaning of 42 U.S.C. § 7411(a)(4) and was a major modification within the meaning of 40 C.F.R. § 52.21(b)(2) and 25 Pa. Code § 127.83. *See also* 40 C.F.R. § 52.21 (1992).   Thus, Reliant was required to obtain a PSD permit before constructing the modification and otherwise comply with the PSD requirements and has a continuing obligation to comply with the PSD requirements.

160.    Neither Reliant nor Sithe applied for or obtain a PSD permit for the Fourth Unit 2 Physical Change in violation of 42 U.S.C. § 7475 and 40 C.F.R. § 52.21.   *See also* 40 C.F.R. § 52.21 (1992).

161.    Before constructing the Fourth Unit 2 Physical Change, Reliant and/or Sithe failed to demonstrate that the emissions increases resulting from the modification would not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality region pursuant to 42 U.S.C. § 7475 or to otherwise comply with any substantive requirements of 40 C.F.R. § 52.21(j) through (r). *See also* 40 C.F.R. § 52.21 (1992).

162.    Reliant and Sithe has operated and/or continues to operate the Plant without a PSD permit without the implementation of BACT for reducing $SO_2$ and $NO_2$ emissions from Unit 2 as required by 42 U.S.C. § 7475(a)(4).

163.    Since constructing the Fourth Unit 2 Physical Change, Reliant and/or Sithe have been in violation of the Act's PSD requirements, 42 U.S.C. §§ 7470 7479, the implementing federal regulations, 40 C.F.R. § 52.21 *et seq.*, and 25 Pa. Code § 127.83.

164.    Upon information and belief, subject to further investigation and discovery, the Defendants may have made other modifications as defined by the PSD regulations to Unit 2.

165.    These violations of the Act, the implementing regulations, and the Pennsylvania regulations will continue unless restrained by an order of this Court.

## ELEVENTH CLAIM FOR RELIEF

### (Title V and Pennsylvania Plan Approval Violations)

166.    Connecticut repeats and realleges the preceding paragraphs as if fully incorporated herein.

167.    The Portland Plant is a "major source" as defined by the Act and implementing regulations, 42 U.S.C. 7661(2); 40 C.F.R. § 70.2, and the Portland Plant is, and at all times relevant to this claim has been, a major source subject to Title V operating permit requirements, 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.3, and/or subject to the plan approval requirements set forth at 25 Pa. Code § 127.11.

168.    As alleged above, Units 1 and 2 became subject to BACT and other PSD and Pennsylvania SIP requirements by virtue of modifications performed at those units between, at least, 1980 and 2005.

169.    The obligation to obtain, as a condition of operations, a permit that contains conditions to ensure the owner/operator's compliance with all applicable requirements is an "emission standard or limitation under this chapter" as defined in Section 304(f) for purposes of jurisdiction under Section 304(a)(1).    42 U.S.C. §§ 7604(f)(4) and 7604(a)(1).

170.    Pursuant to 42 U.S.C. § 7661b(c), any person "required to have a permit," is required to submit a compliance plan and an application for a permit "signed by a responsible official, who shall certify the accuracy of the information submitted."

171.    The Pennsylvania Title V operating permit program regulation, 25 Pa. Code § 127.503, further requires that a source submit a complete application which, among other things,

identifies all applicable requirements, certifies compliance with all applicable requirements, and contains a compliance plan for all applicable requirements for which the source is not in compliance. *See also* 40 C.F.R. § 70.5(c)(8). In addition, a Title V permit application shall "[s]how that the source will not prevent or adversely affect the attainment or maintenance of ambient air quality standards when requested by the Department." 25 Pa. Code § 127.12(6).

172.    No Defendant, in any Title V operating permit application or Title V operating permit renewal application, included (1) a citation and description of applicable PSD requirements including BACT; (2) other specific information that was necessary to implement and enforce other applicable requirements of the Act, *see* 40 C.F.R. Part 70, or to determine the applicability of such requirements, including information about the modifications relevant to determining the applicability of PSD; or (3) a compliance plan including: (i) a description of the compliance status of each stationary source with respect to applicable PSD requirements, (ii) a narrative description of how the Portland Plant would achieve compliance with applicable PSD requirements for which it was not in compliance, and (iii) a schedule or remedial measures leading to compliance with applicable PSD requirements for which the Portland Plant was not in compliance. 40 C.F.R. § 70.5(c)(4), (5) & (8); 25 Pa. Code §§ 127.503(4), (5) and (8).

173.    Further, no Defendant–in any Title V operating permit application or Title V operating permit renewal application–submitted a certification of compliance with applicable requirements that addressed the Defendants' failure to comply with applicable PSD requirements at the Portland Plant. In failing to acknowledge that major modifications took place at Units 1 and 2, the Title V applications' certifications stating that the applications were true, accurate and complete were inaccurate. 40 C.F.R. § 70.5(c)(9) & (d); 25 Pa. Code §§ 127.402(d) & .503(10).

174.    No Defendant supplemented any Title V operating permit application or operating

permit renewal application with information regarding the modifications at Units 1 and 2 or the PSD requirements that are applicable to these two units as a result of these modifications.   40 C.F.R. § 70.5(b).

175.   Because the Defendants failed to provide this information, the Title V operating permit, and all renewed Title V operating permits, issued for the Portland Plant did not include all "applicable requirements," and in particular did not include applicable PSD requirements including BACT emission limitations for Units 1 and 2.   For the same reason, no operating permit included a schedule for compliance with PSD consistent with 40 C.F.R. § 70.5(c)(8) and 25 Pa. Code § 127.513(3).

176.   As alleged above, no Defendant has complied with PSD, including BACT emission limitations, for Units 1 and 2.

177.   Therefore, the Defendants have been and are in violation of Title V requirements of the Act and implementing regulations.

178.   In addition, since at least from the time that the initial Title V permit application was submitted, Defendants have been operating and Reliant continues to operate in violation of the Title V provisions of the Act, 42 U.S.C. §§ 7661-7661f, the implementing regulations, 40 C.F.R. §§ 70.1-70.11, the Pennsylvania SIP as set forth at 40 C.F.R. §§ 52.2020-.2063), and 25 Pa. Code §§ 127.401-.464 & 127.501-.543.

179.   Further, prior to the issuance of the Title V operating permit for the Plant, Metropolitan Edison operated and continued to operate the Portland Plant without obtaining a valid plan approval for the modifications as alleged in this Complaint pursuant to 25 Pa. Code § 127.11.   Metropolitan Edison also failed to submit an application for a plan approval that, among other requirements, demonstrated that the Portland Plant would comply with the CAA, that

emissions from the Portland Plant would be controlled through the use of best available technology, and that the Plant would not prevent or adversely affect the attainment or maintenance of ambient air quality standards.  *Id.* at § 127.12.

180.    Unless restrained by an order of this Court, these violations of the Act will continue.

**PRAYER FOR RELIEF**

WHEREFORE, Connecticut requests that this Court:

A.     Permanently enjoin further operation of the Portland Plant unless the Act, including PSD and Title V, the federal PSD and Title V regulations, the applicable Pennsylvania regulations, and the applicable SIP are fully complied with;

B.     Require the Defendants to implement and/or fund appropriate air pollution control equipment and measures at the Portland Plant as necessary to comply with PSD and Title V of the Act;

C.     Order the Defendants to remedy its past violations;

D.     Order the Defendants to take other appropriate actions to remedy, mitigate, or offset the harm to public health and the environment caused by the violations of the Act and requiring Defendants to install and operate BACT at the Portland Plant for each pollutant subject to regulation under the Act and demonstrate that emissions from the Portland Plant do not cause or contribute to air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant or any NAAQS in any air quality control region;

E.     Order the Defendants to apply for permits that are in conformity with the requirements of the PSD, Title V and Pennsylvania programs;

F.     Order the Defendants to conduct audits of its operations to determine if any additional modifications have occurred that are not included in this First Amended Complaint that would require the Defendants to meet the requirements of PSD, Title V and the Pennsylvania statutes and regulations, and report the results of these audits to Connecticut;

G.     Assess an appropriate civil penalty against the Defendants for their past and

42

ongoing violations of the Act;

     H.  Award Connecticut its costs of this action (including expert witness fees) and

reasonable attorney fees pursuant to 42 U.S.C. § 7604(d); and

     I.  Grant such other relief as the Court deems just and proper.

DATED:  April 2, 2009         Respectfully submitted,

                         RICHARD BLUMENTHAL
                         ATTORNEY GENERAL OF CONNECTICUT

By:                          
                         Scott N. Koschwitz
                         Assistant Attorney General
                         55 Elm Street, P.O. Box 120
                         Hartford, Connecticut 06141-0120
                         Telephone: (860) 808-5250
                         Facsimile: (860) 808-5386
                         scott.koschwitz@po.state.ct.us

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2009, the foregoing First Amended Complaint and associated papers were served upon each of the following by mail, first-class postage pre-paid:

**Attorneys for Reliant Energy Mid-Atlantic Power Holdings, LLC, Reliant Energy, Inc. and Sithe Energies, Inc.**

William M. Bumpers, Esq.
Debra J. Jezouit, Esq.
A. Kent Mayo, Esq.
Baker Botts, LLP
1299 Pennsylvania Avenue, NW
Washington, D.C. 20004

Andrew L. Swope, Esq.
K & L Gates, LLP
17 North Second Street, 18th Floor
Harrisburg, Pennsylvania 17101-1507

**Attorneys for Metropolitan Edison Company**

Michael R. Fox, Esq.
James L. Griffith, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103-7595

David H. Quigley, Esq
Paul E. Gutermann, Esq.
Merideth Bentley, Esq.
Akin Gump Strauss Hauer & Feld, LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564

**Attorneys for the State of New Jersey**

Jon C. Martin, Esq.
Kevin P. Auerbacher, Esq.
Lisa J. Morelli, Esq.
Maurice A. Griffin, Esq.
Ruth E. Carter, Esq.
Timothy P. Crowley, Esq.
Robert J. Kinney, Esq.
New Jersey Division of Law
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ   08625-0093

RICHARD BLUMENHAL
ATTORNEY GENERAL OF CONNECTICUT

By: _____
Scott N. Koschwitz
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, Connecticut 06141-0120
Telephone: (860) 808-5250   Facsimile: (860) 808-5386
scott.koschwitz@po.state.ct.us