IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
STATE OF NEW JERSEY,               )
                                   )  Civil Action
          Plaintiff                )  No. 07-cv-05298
                                   )
          vs.                      )
                                   )
RRI ENERGY MID-ATLANTIC POWER      )
  HOLDINGS, LLC,                   )
RRI ENERGY POWER GENERATION,       )
  INC.,                            )
SITHE ENERGIES, INC.,              )
  now known as Dynegy, Inc., and   )
METROPOLITAN EDISON CO.,           )
                                   )
          Defendants               )
                                   )
     and                           )
                                   )
STATE OF CONNECTICUT,              )
                                   )
          Intervenor-Plaintiff     )
                                   )
          vs.                      )
                                   )
RRI ENERGY MID-ATLANTIC POWER      )
  HOLDINGS, LLC,                   )
RRI ENERGY POWER GENERATION,       )
  INC.,                            )
SITHE ENERGIES, INC.,              )
  now known as Dynegy, Inc., and   )
METROPOLITAN EDISON CO.,           )
                                   )
          Intervenor-Defendants    )
```

                    *         *         *

APPEARANCES:

          RUTH E. MUSETTO, ESQUIRE
          LISA J. MORELLI, ESQUIRE
          JON C. MARTIN, ESQUIRE
          AARON A. LOVE, ESQUIRE
               On behalf of plaintiff State of New Jersey

```
SCOTT KOSCHWITZ, ESQUIRE
     On behalf of intervenor-plaintiff State of
     Connecticut

DAVID H. QUIGLEY, ESQUIRE
PAUL E. GUTERMANN, ESQUIRE
     On behalf of defendant Metropolitan Edison Co.

DAVID A. SUPER, ESQUIRE
A. KENT MAYO, ESQUIRE
WILLIAM M. BUMPERS, ESQUIRE
MICHAEL B. SCHON, ESQUIRE
     On behalf of defendants RRI Energy Mid-Atlantic
     Power Holdings, LLC; RRI Energy Power Generation,
     Inc.; and Sithe Energies, Inc.
```

                              *     *     *

                         O P I N I O N

JAMES KNOLL GARDNER,
United States District Judge

          This matter is before the court on Defendant

Metropolitan Edison Company's Motion for Summary Judgment filed

July 27, 2012.

                        SUMMARY OF DECISION

          For the reasons expressed below, I grant Defendant

Metropolitan Edison Company's Motion for Summary Judgment and

dismiss plaintiffs claims asserted against defendant Metropolitan

Edison Co. ("MetEd").

          Specifically, I conclude that the applicable statute of

limitations bars all of plaintiffs claims asserted against MetEd.

More specifically, I conclude that based on the recent decision

of the United States Supreme Court in <u>Gabelli v. Securities and

Exchange Commission</u>, 568 U.S. __, 133 S.Ct. 1216, __ L.Ed.2d __

                                -2-

(2013), the discovery rule does not apply to the applicable statute of limitations set forth in 28 U.S.C. § 2462 for actions seeking civil penalties.

Moreover, I conclude that plaintiffs have failed to provide sufficient evidence to toll the statute of limitations based on the doctrine of equitable tolling because plaintiffs have not produced any evidence that MetEd concealed its allegedly unlawful conduct from plaintiffs.

Finally, I conclude that the continuing violations doctrine, even if generally applicable to violations of the Clean Air Act, does not provide a basis to permit plaintiffs to recover for MetEd's alleged unlawful conduct because all of MetEd's conduct occurred outside the applicable statute of limitations period.

Accordingly, because none of plaintiffs' claims against MetEd were filed within the applicable five-year statute of limitations, and because plaintiffs have not established a basis for tolling the limitations period, I grant MetEd's motion for summary judgment and dismiss plaintiffs' claims against MetEd.

<u>JURISDICTION</u>

Jurisdiction in this case is based upon federal question jurisdiction pursuant to 28 U.S.C. § 1331.

VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to plaintiff's claims allegedly occurred in Northampton County, Pennsylvania, which is located within this judicial district.

PROCEDURAL HISTORY

Plaintiff, the State of New Jersey, initiated this action on December 18, 2007 by filing an eight-count civil Complaint against Reliant Energy Mid-Atlantic Power Holdings, LLC, Reliant Energy Power Generation, Inc., Reliant Energy, Inc., Centerpoint Energy, Sithe Energies, Inc., Metropolitan Edison Co., and GPU, Inc.  The claims arose from defendants' alleged construction or operation of the Portland Generating Station ("Portland Plant" or "the Plant"), a coal-fired power plant located in Upper Mount Bethel Township, Northampton County, Pennsylvania, across the Delaware River from Warren County, New Jersey.

Specifically, New Jersey's claims arose from the construction or operation of the Portland Plant without permits required by the Clean Air Act ("the Act"), 42 U.S.C. §§ 7470-7503, and the Pennsylvania State Implementation Plan, which incorporates the federal program at 40 C.F.R. Part 52, Subpart NN, §§ 52.2020 to 52.2063.

-4-

On December 4, 2008, New Jersey filed its First Amended Complaint which asserted eleven-counts against defendants Reliant Energy Mid-Atlantic Power Holdings, LLC., Reliant Energy Power Generation, Inc., Sithe Energies, now known as Dynegy, Inc. (collectively the "GenOn defendants")[1], and Metropolitan Edison Co. ("MetEd").

On February 19, 2009, the GenOn defendants filed a motion to dismiss Counts 1-5 and 7-11 of the First Amended Complaint. That same day, MetEd filed a motion to dismiss New Jersey's entire First Amended Complaint.

On October 31, 2008, the State of Connecticut filed a motion to intervene. By Order dated March 24, 2009, I granted the motion and directed Connecticut to conform its complaint-in-intervention to New Jersey's First Amended Complaint and gave Connecticut until April 3, 2009 to file its complaint-in-intervention.

On April 3, 2009, Connecticut filed its complaint-in-intervention, styled "Amended Complaint", against the GenOn

---

[1]     Reliant Energy, Inc., Centerpoint Energy, and GPU Inc., who were named as defendants in the original Complaint, were not included as defendants in the First Amended Complaint.

Reliant Energy Mid-Atlantic Power Holdings, LLC and Reliant Energy Power Generation, Inc., who were named as defendants in the original Complaint, were also named as defendants in the First Amended Complaint. They subsequently changed their names to GenOn REMA, LLC and GenOn Energy Power Generation, Inc. (Second Amended Complaints, ¶ 1). I refer to GenOn REMA, LLC and GenOn Energy Power Generation, Inc. and Sithe Energies, Inc. as the "GenOn defendants".

defendants and MetEd.[2]  New Jersey's First Amended Complaint and Connecticut's First Amended Complaint-in-Intervention sought the same relief based on the same allegations.

On April 23, 2009, MetEd filed a motion to dismiss Connecticut's First Amended Complaint-in-Intervention.  On April 27, 2009, the GenOn defendants filed a motion to dismiss Counts 1-5 and 7-11 of the complaint-in-intervention.

MetEd's motions to dismiss sought dismissal of Counts 5, 6 and 11 because the alleged modifications were made after MetEd was no longer the owner of the Portland Plant.  MetEd sought dismissal of Counts 1-4 and 7-9 as barred by the applicable statute of limitations.

The GenOn defendants sought dismissal of Counts 1-5 and 7-11 of the complaints.  Specifically, the GenOn defendants contended that plaintiffs failed to state a claim in those counts because the GenOn defendants did not own or operate the Portland Plant at the time the modifications to the Plant were made. Additionally, the GenOn defendants contended that those claims were barred by the statute of limitations.

By Order and accompanying Opinion dated September 30, 2009 I granted in part and denied in part MetEd's and the GenOn

---

[2]     On June 1, 2009, with leave of court, Connecticut amended its "Amended Complaint" solely for the purpose of modifying the caption to re-style the document "First Amended Complaint-in-Intervention" and to reflect that Connecticut is the plaintiff-intervenor in this action.  Substantively, the document was identical to Connecticut's "Amended Complaint".

defendants' motions to dismiss.  Specifically, I granted each motion to dismiss to the extent it sought dismissal of Count 11.[3]

I granted MetEd's motion to dismiss to the extent it sought dismissal of plaintiffs claims for injunctive relief against it.[4]  I also dismissed as moot MetEd's motion to dismiss Counts 5-6 and 10 of each complaint because plaintiffs indicated that they were not pursuing those claims against MetEd, but rather were only seeking relief in Counts 5, 6 and 10 from the GenOn defendants.[5]

I denied MetEd's motion to dismiss in all other respects.  In doing so, I specifically held that the discovery rule could be applied to toll the statute of limitations applicable to plaintiffs' claims.  I concluded that based on the face of plaintiffs' complaints, it was not clear when plaintiffs learned, or should have learned, of the alleged Clean Air Act violations.  I also held that dismissal based on the statute of

---

[3]    Count 11 of both complaints alleged that defendants failed to include relevant and required information in their respective applications for permits obtained pursuant to Title V of the Clean Air Act, 42 U.S.C. § 7661-7661f.

   I concluded that Count 11 challenged defendants' submission of allegedly incomplete permit applications, and in order for plaintiffs to challenge the process leading to the defective permits, they had to utilize the process set forth in § 7661d.  Under that section, review of a the administrator's decision to issue a permit was available in the applicable Court of Appeals only.  (See September 30, 2009 Opinion pages 45-46).

[4]    Because MetEd was not the current owner or operator of the Portland plant, I concluded that injunctive relief was not available against MetEd. (See September 30, 2009 Opinion pages 38-39).

[5]    See September 30, 2009 Opinion pages 41-42.  Counts 5, 6 and 10 involved projects commenced after MetEd sold the Plant.

-7-

limitations was not appropriate because plaintiffs could present evidence to establish that the statute of limitations was tolled based on the doctrine of equitable tolling.

I granted the GenOn defendants' motions to dismiss to the extent each sought to strike certain paragraphs from New Jersey's First Amended Complaint and Connecticut's First Amended Complaint-in-Intervention.[6]

However, I denied the GenOn defendants' motions to dismiss in all other respects.  In doing so, I concluded, like I had in denying MetEd's motions to dismiss, that the discovery rule could serve to toll the applicable statute of limitations period for plaintiffs' claims against the GenOn defendants.  I also held that an owner or operator of a plant could be held liable under the Clean Air Act because the preceding owner of the plant failed to secure the appropriate permit and that the prevention of significant deterioration ("PSD") provisions imposed ongoing obligations on owners and operators.[7]

_____

    [6]     Specifically, I concluded that plaintiffs' allegations of "other modifications", without further factual allegations, did not provide the GenOn defendants with fair notice of the claims asserted against them.  Accordingly, I struck those allegations from plaintiffs' complaints, without prejudice for plaintiffs to seek leave to file a supplemental pleading after engaging in discovery.  (See September 30, 2009 Opinion pages 47-48).

    [7]     See September 30, 2009 Opinion pages 38-39, quoting United States v. Ohio Edison Company, 2003 U.S.Dist. LEXIS 2357 at *20 (S.D. Ohio, Jan. 17, 2003).

        The PSD provisions of the Clean Air Act govern sources of pollution in areas which are designated as "in attainment" of the National Ambient Air Quality Standards ("NAAQS") established by the Environmental Protection Agency ("EPA").  42 U.S.C. §§ 7407-7409.

On October 28, 2009 defendants answered New Jersey's First Amended Complaint and Connecticut's First Amended Complaint-in-Intervention.  After conducting substantial discovery, on June 28, 2011 plaintiffs filed a motion for leave to file a second amended complaint.

By Order dated October 6, 2011 and filed October 11, 2011 I granted plaintiffs' motion.  On October 14, 2011 New Jersey filed its Second Amended Complaint and Connecticut filed its Second Amended Complaint-in-Intervention.[8]

On November 14, 2011 defendants filed their respective answers to the complaints.[9]  After conducting additional discovery, on July 27, 2012 MetEd filed the within motion for

---

[8]    New Jersey's Second Amended Complaint and Connecticut's Second Amended Complaint-in-Intervention are not identical, but are substantially similar.  Each complaint asserts eleven claims for relief based upon the same modifications undertaken at the Portland plant, allegedly in violation of the Clean Air Act. The Claims for Relief are number 1-12.  However, both complaints omit a Third Claim for Relief.

Reliant Energy Mid-Atlantic Power Holdings, LLC and Reliant Energy Power Generation, Inc., who were named as defendants in the original Complaint and in the First Amended Complaint, are replaced by RRI Energy Mid-Atlantic Power Holdings, LLC and RRI Energy Power Generation, Inc., respectively, as defendants in the captions of the second amended complaints.

[9]    MetEd also filed motions to dismiss and to strike the complaints to the extent each sought injunctive relief against MetEd.  On November 29, 2011 plaintiffs and MetEd filed a stipulation indicating that they agreed to dismiss Claim 12 of the complaints to the extent it sought injunctive relief against MetEd and that plaintiffs agreed to strike their prayer for injunctive relief against Met-Ed in each of their remaining claims. The stipulation further provided that MetEd agreed to withdraw its motion to dismiss and to strike the complaints.

By Order dated December 7, 2011 and filed December 8, 2011 I approved plaintiffs' and MetEd's stipulation.

summary judgment asserting that it is entitled to judgment on all of the remaining claims against it.

On August 17, 2012 New Jersey and Connecticut each filed responses in opposition to MetEd's summary judgment motion. On September 17, 2012 MetEd filed a reply brief in support of its motion for summary judgment and on October 2, 2012 New Jersey filed a surreply.

On November 1, 2012 plaintiffs each filed a motion for partial summary judgment, in which they asserted that they were entitled to judgment on Claims 4 and 7.  Also on November 1, 2012 the GenOn defendants filed a motion for partial summary judgment, in which they sought judgment on Claims 6, 10, 11 and 12.[10]

On February 22, 2013 I heard oral argument on all of the summary judgment motions in this case and took each motion under advisement.  During oral argument, the GenOn defendants sought to join MetEd's motion for summary judgment.[11]

On February 27, 2013 the United States Supreme Court issued a decision in <u>Gabelli v. Securities and Exchange</u>

---

[10]    These motions remain pending, but are not adjudicated by this Opinion.

[11]    During oral argument on the summary judgment motions, I asked counsel for the GenOn defendants if they intended to argue in response to MetEd's motion for summary judgment.  They responded that they did not intend to argue, but they "join" MetEd's motion. (Transcript of [February 22, 2013] Oral Argument Before the Honorable James [Knoll] Gardner, United States District Judge ("N.T. February 22, 2013 Oral Argument"), page 18).

I did not rule on whether joining was permitted -- however, the facts and legal issues concerning the MetEd statute-of-limitations matter are different from the facts and legal issues concerning the GenOn statute-of-limitations matter.

Commission, 568 U.S. __, 133, S.Ct. 1216, __ L.Ed.2d __ (2013).
That same day, MetEd sought leave to file a brief in support of
its summary judgment motion based on the Gabelli decision.

On March 11, 2013 plaintiffs filed a brief in
opposition to MetEd's supplemental brief.  On March 14, 2013
MetEd sought leave to file a reply to plaintiffs' brief in
opposition to MetEd's brief based on the Gabelli decision.

By Order dated and filed March 22, 2013 I granted
MetEd's motions for leave to file the supplemental brief and
reply brief and indicated that I would consider MetEd's
supplemental brief, and plaintiffs' brief in opposition, and
MetEd's reply brief on the Gabelli decision.

<u>STANDARD OF REVIEW</u>

Rule 56(a) of the Federal Rules of Civil Procedure
permits a party to seek summary judgment with respect to a claim
or defense, or part of a claim or defense.  Rule 56(a) provides,
in pertinent part, that "[t]he court shall grant summary judgment
if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law."  Fed.R.Civ.P. 56(a); <u>National Association for the
Advancement of Colored People "NAACP" v. North Hudson Regional
Fire & Rescue</u>, 665 F.3d 464, 475 (3d Cir. 2012).

For a fact to be considered material, it "must have the
potential to alter the outcome of the case." <u>Id.</u> (citing

-11-

Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)).
Disputes concerning facts which are irrelevant or unnecessary do
not preclude the district court from granting summary judgment.
Id.

Where a party asserts that a particular fact is, or
cannot be, genuinely disputed, the party must provide support for
its assertion. Fed.R.Civ.P. 56(c)(1). Rule 56(c)(1) provides
that party may support its factual assertions by

> (A) citing particular parts of materials in the
> record, including depositions, documents,
> electronically stored information, affidavits
> or declarations, stipulations (including
> those made for purposes of the motion only),
> admissions, interrogatory answers, or other
> materials; or

> (B) showing that the materials cited do not
> establish the absence or presence of a
> genuine dispute, or that an adverse party
> cannot produce admissible evidence to support
> the fact.

When considering a motion for summary judgment, the
district court must view the facts and record evidence presented
"in the light most favorable to the non[-]moving party." North
Hudson, 665 F.3d at 475 (quoting Scott v. Harris, 550 U.S. 372,
380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

If the moving party shows that there is no genuine
issue of fact for trial, "the non-moving party then bears the
burden of identifying evidence that creates a genuine dispute

regarding material facts." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Where a defendant seeks summary judgment, the plaintiff cannot avert summary judgment with speculation, or by resting on the allegations in his pleadings, but rather he must present competent evidence from which a jury could reasonably find in his favor. Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir 1999); Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa. 1995)(Reed, J.).

"Ultimately, [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Id. (quoting Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotations omitted and alteration in original).

REGULATORY FRAMEWORK OF THE CLEAN AIR ACT

Congress passed the Clean Air Act ("the Act") to "preserve, protect, and enhance" the nation's air quality and to protect public health from adverse effects associated with air pollution. See 42 U.S.C. § 7470.

The Act requires the United States Environmental Protection Agency ("EPA") to establish national ambient air quality standards ("NAAQS") for designated pollutants that the EPA has determined may cause or contribute to air pollution

-13-

anticipated to endanger public health or welfare.  42 U.S.C. §§ 7408 and 7409.

The Act also provides for the division of states into air quality control regions and classifying each region as "in attainment", "nonattainment", or "unclassifiable" with respects to NAAQS.  42 U.S.C. § 7407.

Each state is required to submit for EPA approval a State Implementation Plan ("SIP"), which implements, maintains and enforces NAAQS.  A SIP must meet certain minimum standards set forth by the Clean Air Act and EPA regulations in order to be approved by the EPA.  42 U.S.C. § 7410.

Additionally, the Act provides that the EPA develop "technology-based performance standards" designed to limit emissions from major sources of pollution.  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 846, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694, 705 (1984).

The prevention of significant deterioration ("PSD") provisions of the Act govern sources of pollution in areas in attainment with NAAQS.  42 U.S.C. § 7407.

Under the PSD provisions of the Clean Air Act, the owner or operator of an existing major emitting source of pollution must obtain a permit prior to commencing construction on the facility.  42 U.S.C. § 7475(a).

-14-

Among the preconditions for obtaining a permit are utilizing the "best available control technology" ("BACT")[12]. Additionally, the owner of operator of a major emitting facility, for which a permit is required, must conduct monitoring as may be necessary to determine the effect that emissions from the facility have on air quality in the area.  42 U.S.C. § 7475(a).

As part of its SIP, Pennsylvania has incorporated the federal regulations promulgated by the EPA set forth in 40 C.F.R. Part 52, Subpart NN, §§ 52.2020-52.2063.

Under these regulations, an existing source of pollution must obtain a preconstruction permit for any "major modification" to the facility.  A major modification is defined as (1) a "physical change in or change in the method of operation" that would (2) cause a "significant emissions increase" of a regulated pollutant.  40 C.F.R. § 52.21(b)(2).

However, a "physical change" or "change in the method of operation" does not include projects which involve "[r]outine maintenance, repair and replacement."  Projects which constitute routine maintenance to the facility do not require a preconstruction permit.  40 C.F.R. § 52.21(b)(2)(iii)(a).

---

[12]     Best available control technology means an "emission limitation based on the maximum degree of reduction of each pollutant subject to regulation" emitted from a major emitting facility, which the "permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility".  See 42 U.S.C. § 7479(3).

-15-

FACTS

Upon consideration of the pleadings, record papers, exhibits, declarations, and depositions, and drawing all reasonable inferences in favor of plaintiffs as required by the forgoing standard of review, the pertinent facts are as follows.

Defendant Metropolitan Edison, Co. owned and operated the Portland Generating Station from the time it was in operation until November 1999.  The Portland Plant is a coal-fired power plant located in Upper Mount Bethel Township, Northampton County, Pennsylvania, across the Delaware River from Warren County, New Jersey.

The Portland Plant is upwind and directly across the Delaware River and state line from Warren County, New Jersey.  As a byproduct of the production of electricity and as a result of its operations, the Portland plant emits air pollutants including sulfur dioxide ($SO2$), nitrogen oxides ($NOx$), and particulate matter.  Prevailing winds carry these air pollutants from the Portland plant to New Jersey and Connecticut, where they have caused and continue to cause harm to the air quality, citizens, and environments of both states.

Portland has five electricity-generating units.  Only Units 1 and 2 are the subject of this dispute.  Both Units 1 and 2 consist of a coal-fired boiler, which burns coal to transform water into steam, and a steam turbine, which uses the steam to

-16-

generate electricity.  Unit 1 began operating in 1958. Unit 2 began operating in 1962.

In November 1999 MetEd sold the Portland Plant to Sithe Energies, Inc.[13]  However, prior to selling the Plant, MetEd completed multiple construction projects at the Plant, which serve as the basis for plaintiffs' claims against MetEd.

Specifically, between 1983 and 1992 MetEd completed multiple construction projects at Unit 1.[14]  Between 1982 and 1998 MetEd completed multiple construction projects at Unit 2.[15] Each of the projects constituted major modifications within the meaning of 40 C.F.R. § 52.21(b)(2) and therefore required a preconstruction permit.[16]  MetEd did not seek, or obtain, a permit for any of these projects.

None of the subsequent owners of the Portland Station sought, or obtained, a permit for the major modifications undertaken by MetEd.  Units 1 and 2 at the Portland Plant remain

---

[13]    From November 1999 to May 2000, the Plant was owned and operated by Sithe Energies, Inc.  In May 2000, the Plant was purchased by Reliant Energy, Inc.  Reliant Energy later changed its name to RRI Energy, Inc. and later merged with GenOn Energy, Inc., a subsidiary of GenOn REMA, LLC.  GenOn REMA, LLC currently owns and operates the Portland plant.

[14]    These projects provide the basis for plaintiffs First, Second and Fourth Claim for Relief.  (Second Amended Complaint ¶¶ 61-70; 71-79; and 89-97).

[15]    These projects provide the basis for plaintiffs Seventh, Eighth, Ninth and Twelfth Claims for Relief. (Second Amended Complaint ¶¶ 116-125; 126-134; 135-143; and 162-170).

[16]    MetEd contends that these projects were routine maintenance and therefore did not require a preconstruction permit.  However, for purposes of their summary judgment motion, MetEd assumes each project required a permit.

in operation and the GenOn defendants continue to operate the Plant without permits for MetEd's major modifications to the Plant.

Prior to commencing this lawsuit, plaintiffs were generally aware that power plants from neighboring states affected the air quality in New Jersey and Connecticut.[17]

In fact, by 1998 New Jersey was aware that plants in Pennsylvania, including the Portland Plant, may have affected the air quality in New Jersey.[18]

Although plaintiffs were generally aware that emissions from the Portland Plant potentially affected the air quality of New Jersey and Connecticut, information about specific construction projects undertaken by MetEd was not readily available to plaintiffs.

MetEd submitted limited information about some projects to federal and Pennsylvania regulatory agencies.  However, the record is not clear on whether these filings were publically available or otherwise available to plaintiffs.[19]

----

[17]    MetEd's Statement of Facts, ¶ 8; see also United States v. Cinergy Corp., No. 99-1693 (S.D. Ind.); United States v. Ohio Edison Co., No. 99-1181 (S.D. Ohio); United States v. American Electric Power Co., No. 99-1182 (S.D. Ohio).

[18]    MetEd Exhibit 9.

[19]    For example, in 1988 MetEd contends that it submitted a "Five Year Capital Investment Plan" to the Pennsylvania Public Utility Commission.  In that document, MetEd indicated that the Portland Unit 2 boiler waterwall tubes had "experienced extensive failures in the past years due to hydrogen

(Footnote 19 continued):

-18-

Additionally, although MetEd's filings with the regulatory agencies refer to various repair and maintenance projects which were undertaken at the Portland Plant, the information submitted did not indicate that MetEd expected that the future projects would lead to an increase in emissions at Portland.  Nor did the documents indicate that previously completed projects led to an increase in emissions at the Plant.

On January 10, 2001, pursuant to Section 114 of the Clean Air Act[20], the EPA requested that Reliant Energy Incorporated (the owner of the Portland Plant at that time) provide the EPA with "a list of all capital projects greater than $100,000 for which physical construction commenced after January 1, 1978", together with specified records pertaining to those projects.[21]

_____

(Continuation of footnote 19):

embrittlement of the tube wall.  In recent years, the worst of the affected tubes were replaced.  Some are still in need of replacement to reduce leaks and increase the unit availability."  (MetEd Exhibit 22).

However, plaintiffs dispute that these documents were publically available.  Plaintiffs assert that the the Five-Year Capital Investment Plan referred to by MetEd was produced in Pennsylvania Public Utility Commission ("PAPUC") proceedings rather than filed with the PAPUC.  Plaintiffs further indicate that none of the purported publically-available documents are marked "Received and Filed" by the PAPUC.  (See New Jersey's Statement of Facts, ¶ 36).

[20]    Section 114 of the Clean Air Act, codified as 42 U.S.C. § 7414 provides that the Administrator may require any person who owns or operates any emission source to establish and maintain records and report those records for the purpose of determining whether any person is in violation of the Clean Air Act.

[21]    New Jersey Exhibit 9.

-19-

At some point after that, New Jersey requested to be designated as an authorized representative of the United States pursuant to the Clean Air Act.[22]

On July 15, 2003 the EPA granted New Jersey's request to be designated as an authorized representative.  Once it was designated as an authorized representative, New Jersey was permitted to access the documents and records which MetEd had submitted to the EPA pursuant to the EPA's Section 114 request.[23]

After reviewing these documents, New Jersey initiated this action on December 18, 2007 against MetEd and the GenOn defendants asserting violations of the PSD provisions of the Clean Air Act.

CONTENTIONS OF THE PARTIES

MetEd's Contentions

MetEd contends that all of plaintiffs' claims against MetEd are barred by the applicable statute of limitations. Specifically, MetEd contends that a five-year statute of limitations set forth in 28 U.S.C. § 2462 applies to civil suits brought under the Clean Air Act and that plaintiffs' claims against MetEd were not timely filed.  Accordingly, MetEd contends

---

[22]    The record is not clear when New Jersey requested, or what prompted New Jersey to request, to be designated as an authorized representative.  (See N.T. February 22, 2013 Oral Argument, page 53).

[23]    New Jersey Exhibit 26.

-20-

that it is entitled to summary judgment on Claims 1, 2, 4, 7, 8, 9 and 12, the remaining claims asserted against it.

MetEd contends that the decision of the United States Supreme Court in Gabelli v. Securities and Exchange Commission, 568 U.S. ___, 133, S.Ct. 1216, ___ L.Ed.2d ___ (2013), precludes application of the discovery rule to 28 U.S.C. § 2462, which sets a five-year statute of limitations for actions for civil penalties, such as this one.

However, MetEd also contends that, even if the discovery rule can apply to § 2462, the discovery rule does not apply to toll the statute of limitations in this case because plaintiffs did not exercise reasonable diligence in investigating whether MetEd had violated the Clean Air Act.  MetEd asserts that sufficient information was available to plaintiffs to place them on inquiry notice of their potential claims more than five years prior to the filing of this lawsuit.

Additionally, MetEd asserts that the doctrine of equitable tolling does not apply in this case because plaintiffs have not shown that they pursued their rights diligently or that MetEd actively misled them.

<u>Plaintiffs' Contentions</u>[24]:

Plaintiffs contend that summary judgment is not appropriate because their claims are not barred by the statute of limitations.  Plaintiffs agree that the five year statute of limitations set forth in 28 U.S.C. § 2462 is applicable to their claims.  However, plaintiffs contend that the discovery rule and doctrine of equitable toll the applicable statute of limitations.

Plaintiffs contend that the <u>Gabelli</u> holding is not applicable to this case because unlike <u>Gabelli</u>, which was an enforcement action brought by Securities Exchange Commission, this case involves a citizen suit brought to enforce the Clean Air Act.

Moreover, plaintiffs contend that the damages available under the Clean Air Act, as opposed to the damages available under the Investment Advisers Act, as in <u>Gabelli</u>, favor application of the discovery rule because the Clean Air Act authorizes mitigation projects in addition to civil penalties for violations.  Accordingly, plaintiffs contend that the <u>Gabelli</u> decision does not preclude applying the discovery rule to 28 U.S.C. § 2462.

---

[24]     The State of New Jersey and the State of Connecticut filed separate responses in opposition to MetEd's motion for summary judgment. Although the responses are not identical, they advance essentially the same arguments in opposition to summary judgment.  Additionally, at oral argument counsel for New Jersey argued on behalf of New Jersey and Connecticut. Therefore, I address plaintiffs' contentions together.

Applying the discovery rule to this case, plaintiffs contend that their claims are timely because MetEd has not established that plaintiffs failed to exercise reasonable diligence in investigating whether a Clean Air Act violation occurred.  More specifically, plaintiffs assert that they had no reason to suspect that the Portland Station had undergone physical changes which would result in an increase in the emission of sulfur dioxide or nitrogen dioxide.

Plaintiffs contend that they could not obtain sufficient information to evaluate whether MetEd violated the Clean Air Act until plaintiffs were granted authorized representative status by the EPA in September 2003 and entered into a confidentiality agreement with Reliant Incorporated.

Accordingly, plaintiffs contend that their claims are timely because they were filed within five years of September 2003, the point at which plaintiffs reasonably could have discovered MetEd's Clean Air Act violations.

In addition to the discovery rule, plaintiffs contend that the doctrine of equitable tolling is applicable in this case because MetEd did not fulfill its statutory duty to provide Pennsylvania Department of Environmental Protection and the EPA with information regarding prospective emissions prior to undertaking a physical change to the Plant.  Plaintiffs assert that MetEd's failure to report a major modification to the

appropriate regulatory agencies prevented plaintiffs from discovering MetEd's Clean Air Act violations and therefore tolled the applicable statute of limitations.

Finally, plaintiffs contend that because the Portland Plant is still in operation, and because PSD permits impose ongoing obligations on owners and operators, plaintiffs are permitted to recover based on MetEd's conduct which occurred outside the statute of limitations pursuant to the continuing violations doctrine.

Accordingly, plaintiffs contend that MetEd's motion for summary judgment should be denied.

DISCUSSION

Statute of Limitations

The Clean Air Act does not specify a limitations period for when an enforcement action must brought.  Accordingly, the general federal statute of limitations applies to the Clean Air Act.  <u>United States v. Illinois Power Company</u>, 245 F.Supp.2d 951, 954 (S.D. Ill. 2003).

Title 28 of the United States Code Section 2462 provides, in pertinent part:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued....

28 U.S.C. § 2462.

-24-

By the plain language of § 2462, the statute of limitations begins to run when the claim accrues.  As a general matter, a cause of action "accrues" when it has come into existence as an enforceable claim or right."  <u>William A. Graham Company v. Haughey</u>, 646 F.3d 138, 146 (3d Cir. 2011) <u>quoting</u> Black's Law Dictionary (9th ed. 2009).  In other words, a claim accrues when all elements of the cause of action have objectively come into existence.  <u>Id.</u>

Here, MetEd completed the projects without PSD permits allegedly in violation of the Clean Air Act between 1982 and 1998.  MetEd ceased operating the Plant in November 1999.  New Jersey did not file this lawsuit until 2007, more than five years after MetEd's allegedly unlawful conduct.

However, in certain circumstances the "discovery rule", "doctrine of equitable tolling", or "continuing violations doctrine" permit claims to be brought outside the statute of limitations period.

<u>Discovery Rule</u>

The discovery rule provides that the limitations period is tolled until "events occur or facts surface which would cause a reasonably prudent person to become aware that she or he has

been harmed." <u>William A. Graham Company</u>, 646 F.3d at 150 <u>quoting</u>
<u>Epstein v. C.R. Bard, Inc.</u>, 460 F.3d 183, 187 (1st Cir. 2006).[25]

Earlier in this case, I held that the discovery rule
could be applied to toll the statute of limitations, as provided
by 28 U.S.C. § 2462, to actions brought under the Clean Air Act.
<u>See</u> <u>State of New Jersey v. Reliant Energy Mid-Atlantic Power</u>
<u>Holdings, LLC</u>, 2009 U.S.Dist. LEXIS 91617 at *36
(E.D.Pa. Sep. 30, 2009) (Gardner, J.).[26]

Accordingly, I denied MetEd's motion to dismiss and
indicated that plaintiffs claims would be timely if plaintiffs
could establish that their claims were brought within five years
of when they knew, or through the exercise of reasonable
diligence, should have known about the facts giving rise to their

---

[25]    In applying the discovery rule courts have frequently stated that
the discovery rule operates to postpone the accrual date of a cause of action,
rather than toll the statute of limitations.

    Whether a limitations period is considered tolled or the accrual
date is considered postponed is often irrelevant.  The United States Court of
Appeals for the Third Circuit has made clear that the discovery rule serves to
toll the statute of limitations.  <u>See</u> <u>William A. Graham Company v. Haughey</u>,
646 F.3d 138, 146 (3d Cir. 2011); <u>but</u> <u>see</u> <u>Securities and Exchange Commission</u>
<u>v. Gabelli</u>, 653 F.3d 49, 59 (2d Cir. 2011), which noted that under the
discovery rule, "the statute of limitations for a particular claim does not
accrue until that claim is discovered", which contrasts with doctrines of
equitable tolling, which toll the limitations period after a claim has already
accrued.

    In this case whether the discovery rule is considered a doctrine
postponing accrual or a doctrine which tolls the running of the statute of
limitations is not pertinent to MetEd's motion for summary judgment.

[26]    This holding followed <u>L.E.A.D. v. Exide Corporation</u>,
1999 U.S.Dist. LEXIS 2672, at *14 (E.D.Pa. Feb. 19, 1999) (Van Antwerpen, J.),
in which this court held that applying the discovery rule to claims under the
Clean Air Act was appropriate because air pollution violations are difficult
for the public to detect, and the Act has a broad goal of protecting and
enhancing air quality.

claims.  See Reliant Energy Mid-Atlantic Power Holdings, LLC,
2009 U.S.Dist. LEXIS 91617 at *38.

However, on February 27, 2013 the United States Supreme
Court issued a decision in Gabelli v. Securities and Exchange
Commission, 568 U.S. __, 133 S.Ct. 1216, __ L.Ed.2d __ (2013).[27]

MetEd contends that this decision precludes applying
the discovery rule to the statute of limitations, regardless of
whether plaintiffs exercised reasonable diligence in
investigating their claims.  For the following reasons, I agree
with MetEd.

In Gabelli, the Securities and Exchange Commission
brought a civil enforcement action against Marc Gabelli and Bruce
Alpert for violations of the Investment Advisors Act, 15 U.S.C.
§ 80b-9.  2013 U.S. LEXIS  1861 at *7.  As part of such an
enforcement action, the Investment Advisors Act provides that the
SEC may seek civil penalties for violations, in which the five-
year statute of limitations set forth in 28 U.S.C. § 2462
applies.  Id. at *6.

The District Court dismissed the SEC's complaint as
untimely.  However, the United States Court of Appeals for the
Second Circuit reversed, concluding that for violations which
sound in fraud, "[u]nder the discovery rule, the statute of

_____

[27]   Because the decision was issued within the last month, pin
citations are not available in any of the reporters.  Therefore, when citing
the case I will use the citation provided by Lexis Nexis: 2013 U.S.
LEXIS  1861 at * __ (Feb. 27, 2013)

-27-

limitations for a particular claim does not accrue until that claim is discovered, or could have been discovered with reasonable diligence, by the plaintiff." Id. at *9 quoting Securities and Exchange Commission v. Gabelli, 653 F.3d 49, 59 (2d Cir. 2011).

On review, the United States Supreme Court considered whether, under the "general statute of limitations for civil penalty actions,...the five-year clock begins to tick when the fraud is complete or when the fraud is discovered." Gabelli, 2013 U.S. LEXIS 1861 at **5-6.

In reversing the Second Circuit, the Supreme Court held that there was no "textual, historical, or equitable reasons to graft a discovery rule on the statute of limitations of §2462". Id. at *21. Accordingly, the Court held that the discovery rule did not apply to government enforcement actions for civil penalties. Id.

Plaintiffs attempt to distinguish Gabelli from this case. First, plaintiffs contend that the Gabelli decision applies SEC enforcement actions only, and does not preclude application of the discovery rule to actions brought under the Clean Air Act.

However, in Gabelli the Supreme Court made clear that the limitations period provided by 28 U.S.C. § 2462 "is not specific to the Investment Advisers Act, or even to securities

law".  Instead, § 2462 provided a general statute of limitations which "governs many penalty provisions throughout the U.S. Code." Id. at *7.

Nothing in the Gabelli decision indicated that it was analyzing § 2462 as applied to the SEC specifically.  In fact, the Court indicated that applying the discovery rule to any government enforcement action was not practicable because it "is unclear whether and how courts should consider agency priorities and resource constraints in applying that test to Government enforcement actions."  Id. at *19 citing 3M Co. v. Browner, 17 F.3d 1453, 1461 (D.C. Cir. 1994)[28].

Accordingly, the fact that plaintiffs' action is brought pursuant to the Clean Air Act, rather than the Investment Advisers Act, does not provide a basis to apply the discovery rule.

Next, plaintiffs assert that this case is distinguishable from Gabelli because plaintiffs' are a non-regulating state government seeking relief pursuant to a citizen suit provision of the Clean Air Act, as opposed to a government agency, such as the SEC.

This position has some support within the Gabelli decision.  In explaining why applying the discovery rule did not

---

[28]    Notably, 3M Co. v. Browner, cited with approval by the Supreme Court, held that the discovery rule did not apply to § 2462 in a case brought by the EPA for violations of the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2697.

apply to § 2462, the Supreme Court reasoned that the SEC "is not like an individual victim who relies on apparent injury to learn of a wrong", but rather "a central 'mission' of the Commission is to 'investigat[e] potential violations of the federal securities laws.'"  Gabelli, 2013 U.S. LEXIS  1861 at *16 quoting SEC, Enforcement Manual 1 (2012).

Plaintiffs contend that because they do not have regulatory authority over defendants or the Portland Plant, plaintiffs are not in the same position as the SEC in Gabelli, or as the EPA or the Pennsylvania Department of Environmental Protection ("PADEP") to discover violations of the Clean Air Act in this case.

However, applying the discovery rule to citizen suits, but not enforcement actions brought by the government would make little sense.  The citizen suit provision of the Clean Air Act "created 'private attorneys general' to aid in enforcement. Natural Resources Defense Counsel, Inc. v. Environmental Protection Agency, 484 F.2d 1331, 1337 (1st Cir. 1973); see also Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 114 (3d Cir. 1997), which held that "citizen suits supplement government efforts to enforce the [Clean Water] Act."  In fact, in previous filings plaintiffs

readily admitted that they "stand in the shoes" of the federal government.[29]

Accordingly, the statute of limitations under 28 U.S.C. § 2462 as applied to citizen suits should not be tolled "beyond that applicable to the government."  <u>Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.</u>, 913 F.2d 64, 76 (3d Cir. 1990).

Moreover, in "any action" brought pursuant to the Clean Air Act, the EPA, "if not a party, may intervene as a matter of right at any time in the proceeding."  42 U.S.C. § 7604(c). Therefore, applying the discovery rule to citizen suits, but not to the government, would create an untenable scenario in which the statute of limitations would bar the government's claim under the Clean Air Act, but the government could intervene in a citizen suit deemed timely based on the discovery rule.[30]

Therefore, the fact that plaintiffs' action was brought as a citizen suit does not provide a basis to apply the discovery rule.

---

[29]   <u>See</u> Plaintiff's and Plaintiff-Intervenor's Memorandum of Law in Support of Motion to Strike Affirmative Defenses of Metropolitan Edison Company (Document 143-1).

[30]   Furthermore, although the <u>Gabelli</u> decision frequently referred to "Government enforcement actions", <u>Gabelli</u>, 2013 U.S. LEXIS 1861 at * 15, the Investment Advisers Act does not include a citizen suit provision.  <u>See</u> 15 U.S.C. § 80b-9.  Therefore, the Court was not distinguishing between government enforcement actions and citizen suits when referring to the government.

Plaintiffs also contend that <u>Gabelli</u> is distinguishable because the Clean Air Act provides for "beneficial mitigation projects" which serve to compensate plaintiffs for unlawful and excessive air pollution, rather than punish violators of the Act.

In <u>Gabelli</u>, in explaining why the discovery rule did not apply, the Supreme Court stated that the government "is not only a different kind of plaintiff, it seeks a different kind of relief." <u>Gabelli</u>, 2013 U.S. LEXIS 1861 at *17. Specifically, the court noted that actions for civil penalties are intended to punish culpable individuals rather than provide compensatory damages. <u>Id.</u>

Plaintiffs contend that the remedies available to plaintiffs are restorative and compensatory in nature and therefore the relief sought is not the same as the relief the SEC sought in <u>Gabelli</u>. Accordingly, plaintiffs contend that the discovery rule should apply to Clean Air Act violations.

However, the discovery rule exists to "preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury". <u>Id.</u> at *15. Its application hinges on the nature of an injury, not on what remedies are available.[31]

---

[31]    <u>See</u> <u>United States v. Midwest Generation, LLC</u>, 781 F.Supp.2d 677, 692 (N.D.Ill. Mar. 16, 2011), in which the court held that the "rationale of a discovery rule...is inapposite to claims for fines, penalties, and forfeitures, which are a form of punishment asserted in suits regardless of damage."

The prevention of significant deterioration (PSD)
provisions of the Clean Air Act require sources to obtain a
permit prior to commencing a project which qualifies as a major
modification.  See United States v. Ohio Edison Company, 276
F.Supp.2d 829, 834 (S.D.Ohio 2003).  Accordingly, even if the
actual emissions after the project do not amount to a
"significant increase", a source may nevertheless violate the
Clean Air Act if it failed to seek a permit, or analyze projected
emissions before undertaking the project.  Id.

Therefore, the nature of the violation for failing to
obtain a PSD permit under the Clean Air Act is not the type of
injury contemplated by the discovery rule.  In fact, plaintiffs
contend that in certain circumstances actual emissions are not
even relevant to determining whether a source violated the PSD
provisions of the Clean Air Act.[32]

Therefore, just like the SEC in Gabelli, plaintiffs are
seeking a "different kind of relief".  Gabelli, 2013 U.S. LEXIS
1861 at *17.  Specifically, they are seeking an "appropriate
civil penalty" against MetEd for its "violations of the Act".[33]
The availability of remedial projects is not relevant to whether

---

[32]    See Plaintiffs' Motion In Limine to Exclude Evidence of Post-
Project Actual Emissions and Other Evidence Aimed at Jury Nullification
(Document 334).

[33]    See Second Amended Complaint, page 49; Second Amended Complaint-
in-Intervention, page 37.

the discovery rule is applicable to § 2462 for actions brought under the Clean Air Act.

Accordingly, I conclude that the <u>Gabelli</u> decision precludes applying the discovery rule to § 2462.[34]

However, plaintiffs contend that even if the discovery rule does not apply, their claims against MetEd are timely because the doctrine of equitable tolling applies and because PSD violations are continuing violations.

<u>Equitable Tolling</u>

My September 30, 2009 Opinion held that the doctrine of equitable tolling could provide a basis to toll the limitations period set forth under 28 U.S.C. § 2462.  Unlike the discovery

---

[34]     I do not consider my conclusion necessarily inconsistent with the holding in <u>Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.</u>, 913 F.2d 64, 75 (3d Cir. 1990).  In <u>Powell Duffryn Terminals</u>, the United States Court of Appeals for the Third Circuit considered whether a claim brought under the Clean Water Act was timely.  The court held that the five-year statute of limitations under 28 U.S.C. § 2462 began to run at the time defendant filed its Discharge Monitoring Report, rather than at the time a pollutant was discharged.  <u>Id.</u>

However, the court did not refer to the "discovery rule" in determining the accrual date of the Clean Water Act violation.  Moreover, the Clean Water Act places an affirmative obligation on permit holders to submit Discharge Monitoring Reports.  <u>See</u> 33 U.S.C. § 1318.  Therefore, the submission of a report itself, which shows noncompliance with a permit may be considered a violation.  Additionally, the affirmative duty to submit a Discharge Monitoring Report under the Clean Water Act may provide a basis to toll the statute of limitations based on equitable tolling.

Accordingly, <u>Powell Duffryn Terminals</u> did not hinge on the applicability of the discovery rule to 28 U.S.C. § 2462.

-34-

rule, the Gabelli decision does not provide a basis to reconsider that decision.[35]

In contrast to the discovery rule, which "keys on plaintiff's cognizance, or imputed cognizance, of actual injury", equitable tolling "keys on a plaintiff's cognizance, or imputed cognizance, of the facts supporting the plaintiff's cause of action." Wilson v. King, 2010 WL 1071651 at *5, n.8 (E.D.Pa. Mar. 22, 2010) (Tucker, J.).

Under the doctrine of equitable tolling, a statute of limitations can be tolled when principles of equity would make its rigid application unfair. Such a situation arises if (1) defendant has actively misled plaintiff; (2) plaintiff has in some extraordinary way been prevented from asserting his rights; or (3) plaintiff has timely asserted his rights mistakenly in the wrong forum. Urcinoli v. Cathel, 546 F.3d 269, 272 (3d Cir. 2008).

However, equitable tolling is an "extraordinary remedy which should be extended only sparingly." Hedges v. United States, 404 F.3d 744, 751 (3d Cir. 2005). The plaintiff bears the burden of showing that equitable tolling applies. Id. Moreover, like the discovery rule, the doctrine of equitable tolling requires plaintiff to take reasonable measures to uncover

---

[35]   See Gabelli, 2013 U.S. LEXIS 1861 at *10, n.2, indicating that the SEC abandoned "doctrines that toll the running of an applicable limitations period when the defendant takes steps beyond the challenged conduct itself to conceal that conduct from the plaintiff."

the existence his claim.  Wilson v. King, 2010 WL
1071651 at *5, n.8.

Plaintiffs contend that the doctrine of equitable
tolling applies to their claims.  Specifically, plaintiffs assert
that, despite a statutory obligation to the contrary, MetEd
failed to conduct a PSD analysis or apply for a permit prior to
commencing the projects that provide the basis for plaintiffs'
claims.  Moreover, plaintiffs contend that MetEd did not report
these major modifications to PADEP or the EPA.

However, plaintiffs have not produced any evidence
indicating that MetEd "actively misled" them.  Therefore, I
conclude that plaintiffs' have failed to meet their burden to
establish that the doctrine of equitable tolling applies.

Generally, applying the doctrine of equitable tolling
based on fraudulent concealment requires affirmative acts of
concealment.  Accordingly, "mere silence, or one's unwillingness
to divulge one's allegedly wrongful activity is not sufficient."
United States v. Tillson, 2004 U.S.Dist. LEXIS 22246 at *73
(W.D.Ky. Sep. 29, 2004).  However, affirmative acts are not
required in cases founded upon fraud or breach of fiduciary duty.
Id.

Here, plaintiffs do not cite any evidence in the
record, which indicates that MetEd actively misled them.  In
fact, Gary S. Rose, Connecticut's 30(b)(6) witness, stated that

-36-

he was not aware of anything MetEd did which prevented
Connecticut from bringing its claims earlier.[36]

In fact, plaintiffs could not identify what led them to
seek representative status from the EPA, which was what provided
them with sufficient information to determine that PSD violations
had occurred.  Plaintiffs have not asserted that any actions by
MetEd delayed plaintiffs from seeking representative status.[37]

Additionally, while plaintiffs assert that MetEd failed
to self-report major modifications to the EPA and state
regulatory agencies, as required by the Clean Air Act, plaintiffs

---

[36]   MetEd's Exhibit 15, April 2, 2012 30(b)(6) Deposition of Gary S.
Rose ("N.T. Gary S. Rose"), page 69.

Specifically, during his deposition, Mr. Rose testified as
follows, in response to questions by MetEd's attorney, Paul E. Gutermann:

> Q    Did you uncover in course of preparing for your testimony
>      today any information indicating that my client,
>      Metropolitan Edison, did anything to prevent Connecticut
>      from filing its action sooner?
>
> A    Let me see if I understand you.  You're asking me if MetEd
>      did anything to prevent Connecticut from filing this
>      earlier?
>
> Q    Yes.
>
> A    Not that I'm aware of.

N.T. Gary S. Rose, page 69.

Nor did Edward M. Choromanski, New Jersey's 30(b) witness,
identify any facts indicating that MetEd actively misled plaintiffs.  See
March 29, 2012 Deposition of Edward M. Choromanski, pages 221-224.

[37]   See N.T. February 22, 2013 Oral Argument, page 53.

-37-

admit that pollution "sources are *not* required to seek pre-project applicability determinations from the EPA."[38]

A source that does not seek pre-project applicability determinations from the EPA may do so at the risk of violating the PSD provisions of the Clean Air Act.[39]  However, "mere silence, or one's unwillingness to divulge one's allegedly wrongful activity is not sufficient" to establish the applicability of the doctrine of equitable tolling.  See Tillson, 2004 U.S.Dist. LEXIS 22246 at *73.

Plaintiffs have not provided any authority to support their proposition that the failure to apply for a PSD permit, alone, is sufficient to trigger the doctrine of equitable

---

[38]     Plaintiff New Jersey's Surreply Memorandum in Opposition to Metropolitan Edison Company's Motion for Summary Judgment (Document 269), page 5 (emphasis in original).

Rather, regulations promulgated by the EPA provide that a plant is permitted to assess whether any given construction project requires a permit:

> [S]ource owners or operators in most instances are able to readily ascertain whether NSR [(New Source Review)] requirements apply to them. Consequently, in administering these requirements, EPA does not require sources to obtain a formal applicability determination before proceeding with construction.

57 Fed.Reg. 32332 (July 21, 1992).

[39]     An owner or operator of a plant who is uncertain whether a project will trigger PSD may request guidance from the EPA or state permitting agency. For example, in Wisconsin Electric Power Company v. Reilly, 893 F.2d 901, a utility company, prior to commencing construction, sought determination from the EPA and the state regulatory agency as to whether a proposed construction project would trigger the PSD requirements of the Clean Air Act.

In contrast, in United States v. Southern Indiana Gas and Electric Company, 2002 U.S.Dist. LEXIS 13353 (S.D.Ind. Jul. 18, 2002), a utility company which undertook construction projects without a permit, was not shielded from liability because the actual emissions resulting from the project did not increase.  Id. at *10.

tolling.[40]  Moreover, such a position is not consistent with the

principle that equitable tolling serves as an "extraordinary

remedy which should be extended only sparingly."  Hedges,

404 F.3d at 751.

Therefore, MetEd's failure to conduct, and report, a

pre-construction PSD analysis of its projects, without evidence

that MetEd took actions to conceal its alleged violations, is

insufficient to justify applying the doctrine of equitable

tolling.[41]

---

[40]     At oral argument, counsel for plaintiffs stated that the doctrine
for equitable tolling would apply to any claim in which a source did not seek
a PSD permit.  (See N.T. February 22, 2013 Oral Argument, page 53-54).

[41]     In concluding that the doctrine of equitable tolling does not
apply to this case, I find this case distinguishable from Tillson v. Lockheed
Martin Energy Systems, Inc., 2004 U.S.Dist. LEXIS 22246 at *73, which is cited
by plaintiffs.

        In Tillson, the United States intervened in a qui tam action and
filed a complaint, which among other claims, alleged defendants violated the
Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, by
unlawfully handling hazardous waste.  Id. at **51-53.

        The court held that the doctrine of fraudulent concealment could
toll the applicable statute of limitations because defendants had "statutory
and contractual duties to disclose RCRA non-compliances to the government,
represented to [the government] that they were complying with these duties,
and made false and fraudulent statements and claims to the government in both
environmental assessments, inspections, and in environmental reports."
Id. at *74.

        Likewise, this case is distinguishable from United States v.
Cemex, Inc., 864 F.Supp.2d 1040 (S.D.Col. 2012).  In Cemex, the government
alleged that a cement manufacturing plant failed to obtain PSD permits prior
to commencing construction projects in violation of the Clean Air Act.  Id. at
1041.

        Defendant moved for summary judgment based on the statute of
limitations.  The court denied defendant's motion for summary judgment because
factual disputes existed as to whether defendant concealed its wrongdoing,
which would toll the statute of limitations.  Id. at 1049.

(Footnote 41 continued):

Although I conclude that plaintiffs have not produced sufficient evidence to invoke the doctrine of equitable tolling, I still must consider whether plaintiffs' claims are timely pursuant to the "continuing violation" doctrine.[42]

### Continuing Violations

The continuing violations doctrine is an equitable exception to the timely filing requirement.  Cowell v. Palmer Township, 263 F.3d 286, 292 (3d Cir. 2001).  The doctrine provides that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period".  Id. quoting Brenner v. Local 514, United Brotherhood of

---

(Continuation of footnote 41):

However, in Cemex the government produced evidence that defendant did not report modifications despite being advised by the government that the changes would require a PSD permit.  Moreover, defendant affirmatively represented to permitting authorities that no changes had been made to the facility.  Id. at 1048-1049.

This is not the case here.  Plaintiffs have not produced any evidence, or even alleged, that MetEd affirmatively concealed the modifications to the Portland Plant.  In fact, MetEd filed documents with the PAPUC and the Federal Energy Regulatory Commission ("FERC") which referred to at least some of the projects at issue (See MetEd's Exhibits 22 and 26).  These filing may not have been sufficient to put plaintiffs on notice of PSD violations, but do not amount to active concealment.

[42]    Plaintiffs contention that their claims against MetEd were timely filed based upon the continuing violations doctrine does not appear in plaintiffs opposition brief to MetEd's motion for summary judgment.  Nor was the continuing violations doctrine addressed during oral argument.

Rather, plaintiffs raise the continuing violations doctrine as a basis to distinguish this case from Gabelli v. Securities and Exchange Commission.  However, because the continuing violations doctrine is distinct from the discovery rule, I address this contention separately.

-40-

Carpenters and Joiners of America, 927 F.2d 1283, 1295 (3d Cir. 1991).

Accordingly, when the continuing violations doctrine applies, relief may be granted based on conduct that would otherwise be time barred.  Cowell, 263 F.3d at 292.

In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is "more than the occurrence of isolated or sporadic acts."  Id.  In determining the applicability of the continuing violations doctrine, courts should consider (1) subject matter -- whether the violations are of the same type, tending to connect them in a continuing violation; (2) frequency -- whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence -- whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his rights.  See Id.

Plaintiffs contend that prevention of significant deterioration violations are ongoing and therefore their claims against MetEd are timely under the continuing violations doctrine.  To support this contention, plaintiffs contend that, in denying the GenOn defendants' motion to dismiss, my

September 30, 2009 Opinion held that PSD violations are ongoing.[43]

However, plaintiffs overstate the implications of my previous holding.  In my September 30, 2009 Opinion I held that "an owner or operator may be held liable for failure to comply with [Clean Air Act] standards simply because its predecessor owner failed to secure the appropriate permit."[44]  My holding was

---

[43]     I am aware that since the time of this decision, the majority of courts have held that the failure to obtain a PSD permit constitutes a one-time violation, which occurs when construction is commenced, but does not continue past the date when construction is completed.  See Sierra Club v. Portland General Electric Company, 663 F.Supp.2d 983, 991-992 (D.Ore. 2009) (compiling cases); see also Sierra Club v. Otter Tail Power Company, 615 F.3d 1008, 1016 (8th Cir. 2010), which held that a source which violates the PSD provisions of the Clean Air Act "by failing to apply for PSD permits in the first place, does not continue to do so by failing to comply with a hypothetical set of operational parameters that would have been developed through the permitting process."

     I am also aware that the recent decision in United States v. EME Homer City Generation, L.P., 823 F.Supp.2d 274 (W.D.Pa. 2011), which held that PSD violations are not ongoing, is presently on appeal before the United States Court of Appeals for the Third Circuit.

     That appeal may impact my September 30, 2009 holding as it pertains to the GenOn defendants because their liability for certain claims may hinge on whether the PSD provisions create ongoing obligations.

     However, that decision is not pertinent to MetEd's motion for summary judgment because MetEd sold the Portland Plant to the GenOn defendants in November 1999.  Therefore, even if the PSD provisions create ongoing obligations for source owners, MetEd's violations of the Clean Air Act, if any, would have occurred outside the limitations period.

     I note that at oral argument, the GenOn defendants purported to join MetEd's motion for summary judgment. (See N.T. February 22, 2013 Oral Argument, page 53).  However, the statute of limitations as applied to MetEd potentially differs from how the statute of limitations applies to the GenOn defendants because the GenOn defendants continue to operate the Portland Plant.

     Therefore, to the extent I determine that it is necessary to revisit my holding that the PSD provisions impose ongoing obligations on sources, I will do so in adjudicating the GenOn defendants' motion for summary judgment.

[44]     September 30, 2009 Opinion, page 38.

based on concluding that a PSD permit, which was not obtained by MetEd, would have required utilizing the best available control technology, and that the GenOn defendants continued to operate the Portland Plant without that technology.[45]

Although I concluded that the PSD provisions impose ongoing obligations on an owner or operator of a plant, I did not conclude that PSD violations were "continuing violations", which would permit plaintiffs to recover for conduct outside the limitations period.[46]

Here, however I do not need to consider whether violations of the PSD provisions of the Clean Air Act constitute continuing violations because even if the continuing violations doctrine generally applies to Clean Air Act violations, it does not apply to plaintiffs' claims against MetEd in this case.

---

[45]    See Id.

[46]    Rather, courts that have concluded that the PSD provisions of the Clean Air Act impose ongoing obligations on the owner or operator of a plant, have concluded that "each day a facility operates absent a PSD permit and absent [best available control technology] constitutes a discrete violation of the [Clean Air Act]." Sierra Club v. Portland General Electric Company, 663 F.Supp.2d 983, 994 (D.Ore. Sep. 30, 2009) citing National Parks Conservation Association, Inc. v. Tennessee Valley Authority, 480 F.3d 410, 416-417 (6th Cir. 2007).

Accordingly, in Sierra Club v. Portland General Electric Company the court held that operating a plant without a PSD permit is not a "continuing violation[] within the meaning of the 'continuing violations doctrine.'" Id. Despite the ongoing obligations on owners and operators, the court held that PSD violations were still subject to the five-year statute of limitations and that an owner or operator which operates a plant in violation of the PSD provisions "may be held liable only for the five years of violations preceding suit." Id.

In November 1999 MetEd sold the Plant to Sithe Energies, Inc.  Therefore, even if MetEd's operation of the Plant without a permit was a continuing violation, MetEd's last unlawful act could not have occurred after November 1999.  Under the continuing violations doctrine, an action is timely only if "the last act evidencing the continuing practice falls within the limitations period".  <u>Cowell</u>, 263 F.3d at 292.

Because MetEd ceased operation of the Plant in 1999 and plaintiffs did not file this action until 2007, the continuing violations doctrine does not provide a basis to permit plaintiffs to obtain relief for MetEd's alleged violations, which occurred outside the statute of limitations.

<u>CONCLUSION</u>

The conduct, which provides the basis for plaintiffs claims against MetEd, occurred in November 1999 at the latest. This action was not filed until 2007, more than 5 years after the allegedly unlawful conduct.

Because the discovery rule does not apply to the applicable statute of limitations, because plaintiffs have not provided sufficient evidence to invoke the doctrine of equitable tolling, and because even if the continuing violations doctrine were applicable, it would not render plaintiffs' claims timely, plaintiffs' claims against MetEd are barred by the statute of limitations.

-44-

Therefore, for all of the foregoing reasons, I grant MetEd's motion for summary judgment and dismiss plaintiffs' claims asserted against MetEd.